Edward Pool and Lottie Pool et al. [1] v. Commissioner. Pool v. Commissioner
Docket Nos. 36108-36114.
United States Tax Court
T.C. Memo 1956-64; 1956 Tax Ct. Memo LEXIS 229; 15 T.C.M. (CCH) 296; T.C.M. (RIA) 56064; March 20, 1956
Irving I. Axelrad, Esq., for the petitioners. Donald P. Chehock, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax against the petitioners as follows: Docket No.
Year
Deficiency
36108
Edward Pool and Lottie Pool
1948
$ 29,399.88
36109
Edward Pool
1946
12,919.82
1947
100,829.79
36110
Lottie Pool
1946
12,919.82
1947
100,829.78
36111
William K. Murphy
1946
12,569.14
1947
112,359.85
36112
Edna Murphy
1946
12,569.13
1947
112,359.84
36113
William K. Murphy and Edna Murphy
1948
28,207.82
36114
Artcraft Builders, Inc.
1946
48,814.50
*230 The questions for decision are (1) whether in 1944 and 1946 Artcraft Builders, Inc., realized gain as the result of transfers or distributions made by it to its stockholders; (2) whether by reason of the transfers or distributions in 1946, the stockholders received income; and (3) whether in the selling of 170 duplexes which had been transferred or distributed to them in the years above, the stockholders were selling property held by them primarily for sale to customers in the ordinary course of their business, to the end that the gain realized was not capital gain, as claimed by them, but ordinary income. Findings of Fact Some of the facts have been stipulated. Edward Pool and Lottie Pool are husband and wife. They filed their income tax returns on a cash basis and by calendar years, and their returns for the years herein were filed with the collector of internal revenue for the sixth district of California. For the years 1946 and 1947 they filed separate returns. For the year 1948 they filed a joint return. William K. Murphy and Edna Murphy are husband and wife. They filed their returns on a cash basis and by calendar years, and their returns for the years herein were filed *231 with the collector of internal revenue for the sixth district of California. For the years 1946 and 1947 they filed separate returns. For the year 1948 they filed a joint return. Artcraft Builders, Inc., sometimes referred to as Artcraft, is a California corporation. Until 1944, its principal place of business was in Los Angeles. Since 1945 its principal place of business has been in Long Beach. At all times material herein it kept its books on an accrual basis and filed its income tax returns for calendar years with the collector of internal revenue for the sixth district of California. Artcraft was organized on March 10, 1941. Its authorized capital stock consisted of 4,000 shares of Class A preferred stock and 21,000 shares of Class B common stock. Both classes of stock had voting rights, share for share. The Class A shares carried the right to cumulative dividends at 8 per cent. At the time of incorporation the 4,000 shares of Class A stock were issued, 800 shares to R. T. Cooke and Mary Cooke and 3,200 shares to J. S. A. Smith and Gertrude C. Smith. Of the Class B common stock, 3,000 shares were issued, 200 shares to R.T. and Mary Cooke; 800 shares to J. S. A. and Gertrude *232 C. Smith; 1,000 shares to Edward Pool and 1,000 shares to William K. Murphy. Artcraft was organized to engage in residential building construction. During 1941 most, if not all, of its business was that of constructing houses under contract for others. During 1942 the major portion of its income was derived from building houses for sale for its own account, although it did have some income from building contracts. In 1942 it built for sale on its own account and sold 142 houses in Los Angeles County. In 1943 it built for sale on its own account and sold 188 houses, all of which were likewise located in Los Angeles County. It derived no income in 1943 from building under contract for others. Edward Pool was named president of Artcraft. He had been a builder during all of his business life. Prior to 1935, when he moved to Long Beach, he had lived in Cincinnati, Ohio, and had built houses in that area. During the period of his operations in the Cincinnati area and after moving to Long Beach, but prior to the organization of Artcraft, he had built houses both for sale on his own account and for others under contract. He had never built rental houses for his own account. Throughout *233 his operations he sold all of his houses through brokers. He never had a real estate broker's license and never sold any houses personally. William K. Murphy moved to California from Illinois in 1933. Prior to that time he had been variously employed. For a short period he had done office work for a concern which built houses. About 1938 he started working as an employee of "Pacific Construction and Finance." While with that concern he worked on "rough drafts of sketches of apartment buildings and home layouts." This work continued until he became connected with Artcraft. He had never sold real estate or had a real estate broker's license. According to the corporate minutes, his employment with Artcraft in 1942 was that of sales manager. At a meeting of the board of directors of Artcraft held on August 18, 1942, Murphy reported that 24 houses had been "sold to date." Action was taken to increase loans on 126 houses then under construction and to proceed with plans for the construction of 86 more houses. Pool "brought up the question of building 27 income units in addition, but this proposal was turned down." At a special meeting of the board of directors of Artcraft held on February 17, 1943, Pool *234 reported that sales had been made of 36 houses under construction in a designated tract; that all foundations and rough carpenter work had been completed on 86 houses; and that arrangements would be made to start work on 100 houses in another tract. Pool "also reopened the subject to building residential income in two, three and four unit apartments. The subject was discussed and decided not to take any action at this time, but to hold it open for future consideration." On February 24, 1943, Artcraft made application to the Federal Housing Administration of the War Production Board to build for war housing 22 multiple dwelling structures, containing 68 family units, in Tract No. 11674, and on May 26, 1943, made application to build 70 duplexes, containing 140 units, in Tract No. 11451, both tracts being located near Long Beach and the Douglas Aircraft plant. These projects were to be, and were franchised through F.H.A. Title VI loans with Western Federal Savings and Loan Association of California. As a part of its application in each instance, Artcraft agree that it would hold for rent the accommodations contemplated at rentals per unit not in excess of monthly charges designated *235 in the application, except as otherwise authorized by General Orders 60-2 and 60-3 of the National Housing Agency, and that it would not include in the lease of said accommodations any option to purchase except in accordance with said general orders; and further, that, except as authorized by the said general orders, it would not otherwise dispose of or enter into any agreement or contract for the disposal of any of the said accommodations, or any title interest, and that it would notify any transferee of the said accomodations that he must comply with the provisions of the said general orders relative to occupancy. In April of 1943, 25,000 additional shares of Artcraft Class B common stock were authorized and issued, 8,400 shares to Edward Pool, 8,300 shares to William K. Murphy, 6,600 shares to J. S. A. Smith and 1,700 shares to R. T. Cooke. Subsequently, and on or about June 1, 1943, William K. Murphy and Edward Pool and their wives purchased all of the Artcraft stock held by the Smiths and Cookes, [2] and on June 8, 1943, Smith and Cooke resigned as officers and directors of the company. At all times thereafter, Edward Pool, Lottie Pool, William K. Murphy and Edna Murphy have *236 been the sole stockholders of Artcraft, the Pools owning 14,050 shares of Class B stock as community property and the Murphys owning 13,950 shares of such stock as community property. Each couple from that date has owned 2,000 shares of the Class A preferred stock as community property. The cost to each couple for all of the shares owned by them was $16,000. The application, filed on February 23, 1943, for approval of the proposed construction of 22 multiple dwelling units on Tract 11674, was approved by the Federal Housing Administration on June 1, 1943, and by the War Production Board on June 7, 1943. The application, filed on May 26, 1943, for approval of the proposed construction of 70 duplexes on Tract No. 11451, was approved by the Federal Housing Administration, on June 7, 1943, and by the War Production Board on June 16, 1943. General Orders 60-2 and 60-3 were part of the Operating Manual, National Housing Agency, General Order No. 60-2 being designated "PUBLIC REGULATIONS - Occupancy and Disposition of Private War Housing," and General *237 Order No. 60-3, as "PUBLIC REGULATIONS - Methods of Disposition of Private War Housing Including Rent Levels, Sales Prices, and Petitions to the National Housing Agency." General Order 60-2 recited that the National Housing Agency was responsible for the proper occupancy of housing programmed for war workers and for the adoption of regulations assuring that war housing would be held available for eligible war workers for the duration of the national emergency declared by the President on September 8, 1939. Under the order, private war housing was to be regarded as "begun" on the date of submitting to the Federal Housing Administration a properly executed application for priority assistance or authority to begin construction in connection with such housing, and the date of "completion" was to be the date upon which such housing was offered for initial rental or sale, or the date upon which it was first ready for immediate occupancy, whichever was later. The phrase "held for rental" included "only an ordinary landlord-tenant relationship or such a tenancy coupled with an option to purchase." Under the option, the tenant was not to be obligated to purchase and the option was to run *238 only in his behalf. The selling price was to "be a fair market price, or $6,000," whichever was lower. The option to purchase could not be exercised prior to the expiration of four months' occupancy, and was to continue for at least 30 months, unless sooner exercised. Private war housing begun on or after February 10, 1943, was to be made available for initial occupancy, and for reoccupancy, only by eligible war workers. It was provided, however, that at any time subsequent to 60 days after completion of such housing, the owner might petition the National Housing Agency to permit initial occupancy, or reoccupancy, as the case might be, by a person other than an eligible war worker. Except for involuntary transfers, private war housing could be disposed of (a) only to an occupant, after 4 months' occupancy; (b) to a person who would not himself occupy the housing, provided the occupancy and disposition limitations applicable prior to purchase or acquisition should continue to be applicable after such purchase or acquisition; or (c) at any time subsequent to 60 days after completion of any such housing, the owner might petition the National Housing Agency to permit disposition otherwise *239 than as indicated in (a) and (b). General Order 60-3 was designed to implement the occupancy and disposition policies of the National Housing Agency applicable to all private war housing as stated in General Order No. 60-2. It also provided that for the duration of the national emergency declared by the President on September 8, 1939, all private war housing begun on or after February 10, 1943, should be held for rental to eligible war workers as provided in General Order No. 60-2, at the rentals specified in the application, which rentals should in no event exceed $50 per month shelter rent for one unfurnished dwelling unit, plus a reasonable charge for tenant services, which was not to exceed $3 per month per room. It also carried provision that "a dwelling unit * * * may be purchased by an occupant * * * after four months of continuous occupancy," but that the purchase price might not exceed the fair market price, or $6,000, whichever was lower. In the case of such sale, the seller was required to submit an agreement on the part of the purchaser that such purchaser would continue to occupy the dwelling unit, or would hold the unit subject to the occupancy and disposition provisions *240 set forth in General Order No. 60-2. Subject to the same restrictions as to price, such houses could also be transferred to a person who would not become an occupant thereof, but only if an agreement was submitted stating that the housing would be held subject to the provisions of General Order No. 60-2. Further, at any time subsequent to 60 days after completion, the original owner or a subsequent owner might petition the National Housing Agency to permit disposition otherwise than as provided above. General Order No. 60-3 was thereafter superseded by General Orders Nos. 60-3A, 60-3B, which became effective August 25, 1943, and 60-3C, which became effective November 12, 1943. In so far as appears, the superseding orders were, for the purposes here, substantially the same as General Order No. 60-3. At a special meeting of Artcraft's board of directors held on September 16, 1943, Pool stated that he and Mrs. Pool and Murphy and Mrs. Murphy desired "to take over" the title to and become the owners of the 22 lots in Tract 11674 and the 70 lots in Tract 11451, together with all buildings then erected and those to be erected thereon, that they desired to take title as tenants in common, *241 each owning an undivided one-fourth interest therein, and in addition, that all moneys obtained from loans thereon over and above actual cost should likewise be transferred to them as tenants in common, "in consideration of which the corporation should retain all rentals and/or payments received upon any of said buildings up to the time of such take-over, and further, that while he, William K. Murphy, Edna Murphy and Lottie Pool would assume no personal responsibility they would nevertheless agree that so long as rentals or sales of said properties produced sufficient funds, that of such funds as received a portion thereof would be paid over to persons, firms or corporations holding encumbrances against said properties sufficiently to liquidate payments upon said encumbrances as the same fell due, strictly in accordance with but not in excess of the requirements of said encumbrances, respectively, no personal obligation however being assumed by any of the above named persons." Thereafter a motion was made, and carried, wherein "it was ordered that this corporation shall and does hereby agree to sell and transfer" to the four individuals named the properties in question, according to *242 the terms which had been outlined by Pool, and providing further for application and payment by Pool, Murphy and their wives from moneys thereafter received from "the sale, hypothecation or rentals of said properties of all sums accruing in accordance with the terms of any and all indebtedness or obligations now or hereafter existing against said properties respectively." But it was expressly provided that there was to be no personal liability on the part of the individuals, "or either of them," for payment of the "moneys owing upon said mortgages or encumbrances or the notes thereby secured other than as received from sales, hypothecation or rentals of said property and then only so much thereof as is called for in and required by said encumbrance obligations." The motion also provided fo the transfer to the four individuals of all sums of money remaining in the hands of Artcraft from sums theretofore borrowed for "the purchase of said property and the erection of said buildings and improvements thereon after deducting from said sums the actual cost of such land, buildings and improvements." A motion was next adopted that thereafter all profits from the sale, rental or hypothecation *243 of the properties over and above the amount "of said mortgage indebtedness" should be and remain the sole and exclusive property of the four individuals as tenants in common. [3]
The total consideration for which Artcraft purchased the land known as Tract 11451 was $12,195. On some undisclosed date Pool and Murphy had each advanced $3,000 to Artcraft towards the purchase of the land in question. At a special meeting of Artcraft's board of directors on October 23, 1943, Pool *244 brought up the matter of the loans by him and Murphy, and requested that the corporation execute to each of them its promissory note for the amount advanced. A motion was made, and carried, that the notes suggested be issued, payable 30 days from date, without interest. Generally speaking, the dwelling units on Tracts 11674 and 11451 were rented as construction was completed. The first unit to be rented was in one of the 22 apartment buildings on Tract 11674. It was rented on the day before Thanksgiving in 1943. The terms and conditions under which the said housing was rented, included rental rates, were in keeping with the requirements of General Orders Nos. 60-2 and 60-3. The initial leases were for a period of one year. A few of the apartments may thereafter have been leased for longer periods. At a special meeting of Artcraft's board of directors held on March 31, 1944, Pool advised that all buildings on Tracts 11674 and 11451 would be completed by the night of that day, and that "the time had now arrived when he and Mr. Murphy, together with their respective wives, could expect the completion of the contract entered into by and between this corporation and he and Mr. Murphy *245 and their respective wives on September 16, 1943." A motion was made, and carried, that the president and secretary be authorized, empowered and directed to "carry out the terms of the agreement entered into between this corporation and Edward Pool, Lottie Pool, William K. Murphy and Edna M. Murphy as reflected in the minutes * * * covering the meeting held September 16th, 1943, and in so doing to transfer all the title" of Artcraft in the 22 lots and buildings in Tract 11674 and the 70 lots and buildings in Tract 11451 to the four individuals, as tenants in common, and further, to transfer unto them all moneys theretofore obtained by Artcraft in the form of loans upon the said property for the erection of the said buildings remaining over and above the actual costs thereof, and that the transfers be so drawn that no personal responsibility should be assumed by the four individuals, or either of them, "with reference to the payment of any obligations against said property or properties"; provided, however, that the four individuals furnish to the corporation "their written agreement that so long as rentals of said properties produce sufficient funds, that of such funds as received *246 a portion thereof would be paid over to persons, firms or corporations holding encumbrances against said properties sufficiently to liquidate payments upon said encumbrances as the same fell due, strictly in accordance with but not in excess of the requirements of said encumbrances, respectively, no personal obligation however being assumed by any of the above named persons; all of the foregoing being subject to the provision, however, that this corporation shall retain all rentals and/or payments received upon any of said buildings up to the time of the execution of said instrument of conveyance." After the adoption of the motion, Pool, for himself and the other three stockholders, delivered an instrument whereby the four individuals agreed "that so long as rentals or sales of said properties produced sufficient funds, that of such funds as received a portion thereof would be paid over to persons, firms or corporations holding encumbrances against said properties sufficiently to liquidate payments upon said encumbrances as the same fell due, strictly in accordance with but not in excess of the requirements of said encumbrances, respectively, no personal obligation however being assumed *247 by any of the above named persons." According to the minutes, deeds conveying the said properties to the four individuals, "as tenants in common, each owning an undivided one-fourth interest therein, in accordance with the foregoing motion," were thereupon delivered. The total cost to Artcraft of Tract 11451, with improvements, was $477,947.74, being $45,800.63 representing land and subdivision costs and $432,147.11 representing cost of buildings. With respect to the said property Artcraft had received F.H.A. insured loans, through Western Federal Savings 1nd Loan Association, of $525,000 and had executed trust deeds therefor. The difference between the cost of the properties composing Tract 11451 and the loan, or $48,052.26, [4] was made available to Pool, Murphy and their wives by credit entries. The total cost to Artcraft of the land and buildings of Tract 11674 was $228,982.72, representing $26,842.97 as land and subdivision costs and $202,139.75, as the cost of the buildings. *248 The amount of the F.H.A. insured loans received by Artcraft on the said property was $212,614.41. On or about April 1, 1944, Edward Pool, Lottie Pool, William K. Murphy and Edna Murphy "formed a joint venture (or partnership) known as Edward Pool and Associates." Edward Pool and Associates, sometimes referred to as Associates, was formed for the purpose of holding and dealing with the properties which had been transferred by Artcraft to the said four individuals as above shown. Associates kept its books under an accrual method of accounting and on the basis of a fiscal year ending January 31. It filed partnership returns of income, Form 1065, for the fiscal years ended January 31, 1945, through January 31, 1950, inclusive. At some time prior to June 14, 1944, Pool and Murphy began the construction of a market building on a lot owned by them and their wives in Long Beach. The actual construction work was done for them by Artcraft. There was no written contract or agreement with respect to the work Artcraft was doing, but at a special meeting of Artcraft's board of directors on June 14, 1944, after Pool had recited that Artcraft was doing the work for the individuals named "upon *249 a basis of cost plus 10%," a motion was made, and carried, that the contract for construction of the market building in the terms stated be ratified, confirmed and approved. The completed cost of the market building to the four individuals was $51,409.95. At all times since its completion, the building has been rented, and at the time of the trial herein was still owned by the four individuals. Under date of January 4, 1945, Artcraft made a priorities application to the National Housing Agency of the Federal Housing Administration for the construction of 100 duplexes on Tract No. 13163 in Long Beach. As in the case of the construction heretofore described on Tracts 11674 and 11451, Artcraft, as a part of its application, represented that it would hold the proposed accommodations for rent and would rent them only to eligible war workers as defined in the National Housing Agency's General Order No. 60-1, and that any sales thereof would be only as permitted by National Housing General Orders Nos. 60-2 and 60-3; and further, that rents and other charges to tenants would not be in excess of the amounts thereafter shown in the application, which schedule indicated a charge of $42.50 as *250 shelter rent and $7.75 as a charge for services, making a total charge of $50.25 per month. In making the application, Artcraft represented itself as the project owner. The application was approved under date of February 5, 1945. This project was financed through F.H.A. insured loans from Western Federal Savings and Loan Association aggregating $724,685. At a special meeting of Artcraft's board of directors held on February 26, 1945, Pool stated that he and Murphy were willing to "take over" title to and become the owners of the 100 lots in Tract 13163, and desired to take such title in the names of William K. Murphy, Edna Murphy, Edward Pool and Lottie Pool, as tenants in common, each to own an undivided one-fourth interest therein, but that they desired to take title only after the buildings had been fully erected and completed and all other contemplated improvements had been made upon the said lands; "that in consideration of said transfer the corporation should and could retain all rentals and/or payments received upon any of said buildings up to the time of such take-over, * * * until the same shall have accumulated the sum of $20,000.00 which said sum of money shall be retained *251 by Artcraft Builders, Inc. as its consideration for this agreement and for the then transfer by Artcraft Builders, Inc. of all its rights, title and interest in and to said property and in and to all funds then remaining in the hands or to the credit of said Artcraft Builders, Inc. which said funds had been borrowed, accumulated or setaside for the construction of said buildings upon said tract." Pool then stated that he and his associates would take title subject to any and all encumbrances against the property "at the time of such take-over," but that it should be definitely understood that neither he nor any of the other grantees would assume any obligation for the liquidation of such encumbrances, but that they would agree "that so long as rentals or sales of said properties produced sufficient funds, that of such funds as received a portion thereof would be paid to persons, firms or corporations holding encumbrances against said property sufficiently to liquidate payments upon said encumbrances as the same fell due, strictly in accordance with but not in excess of the requirements of said encumbrances, respectively, no personal obligation however being assumed by any of the above-named *252 persons." A motion was thereafter made, and carried, that Artcraft did agree to transfer to the individuals named, as tenants in common, the said 100 lots of Tract 13163, "together with any and all buildings and improvements erected or to be erected thereon in accordance with the present plans of the corporation," and further, was to transfer to the four individuals, as tenants in common, all sums of money remaining in its hands from the sums borrowed for the purchase of the said property and the erection of the buildings and improvements thereon after deducting the cost of the land and the buildings and improvements, these transfers to be according to the conditions as outlined in Pool's proposal above. It was further provided that any and all profits thereafter remaining from rent, sale or hypothecation of the said properties over and above the amount of the mortgage indebtedness should be and remain the sole and exclusive profit of the four individuals. At the regular meeting of Artcraft's board of directors held on February 1, 1946, Pool stated that all buildings and improvements on Tract 13163 were fully completed and that he, Lottie Pool, William K. Murphy and Edna Murphy *253 "were desirous of completing the contractual relationship entered into by this corporation and Mr. Pool and the above-mentioned associates on the twenty-sixth day of February, 1945." He stated that at the time of the 1945 meeting, it was then believed "that it would only be possible in the carrying out of the said transaction to permit the retention of the sum of TWENTY THOUSAND DOLLARS ($20,000.00)by this corporation as a consideration passing to it for said transfer, but that since the completion of the buildings he and his associates * * * were willing to increase the amount of said retention from TWENTY THOUSAND DOLLARS ($20,000.00) to NINETY THOUSAND DOLLARS ($90,000.00)." A resolution was then adopted for the transfer of the properties by "a good and sufficient deed of conveyance." A second resolution was then proposed, and adopted, to the effect that Artcraft also transfer to the four individuals, as tenants in common, all sums of money borrowed for the purchase of the property and the erection of the buildings and improvements remaining in its hands over and above the actual cost of the land, buildings and improvements; and further, that it likewise transfer to the said individuals *254 the sums remaining in its hands from either rentals or payments for the said property since the erection of the buildings, which up to and including the first day of February 1946, was in excess of the sum of $90,000, the $90,000 to be retained by Artcraft "as a consideration for the transfer of said property and of said sums of money so remaining from the sums borrowed for the purchase of said property and the erection of said buildings and improvements thereon." The resolution also provided that it should be "expressly recognized that no personal liability" was then or at any other time assumed or intended to be assumed by the four transferees for the payment of any sums of money owing upon any mortgages, encumbrances or notes secured thereby, which said mortgages attached to the said properties, and that their responsibility for payment of "said indebtedness" should apply "only to such sums of money as may be by them or either of them received from the sale, hypothecation or rentals of said property, and then only so much thereof as is called for by said encumbrances." It was further resolved that any and all profits which might thereafter accrue from the sale, rental or hypothecation *255 of the property over and above the amount of the mortgage indebtedness should be and remain the sole and exclusive property of the four individuals, "each owing an undivided one-fourth interest therein." Pursuant to the resolution adopted at the meeting of Artcraft's board of directors on February 1, 1946, the title to the 100 duplexes on Tract 13163 was conveyed to Pool, Murphy and their wives, as tenants in common, by a deed bearing date of March 21, 1946. [5] In the deed, it was stated that the grant therein was "Subject to any and all encumbrances thereon, none of which are in any wise assumed by said grantees or either or any of them." The total cost to Artcraft of the properties, title to which was so transferred, had been $588,886.81, consisting of $63,013.81 representing land and subdivision costs and $525,873 representing the cost of the buildings. The amount of the F.H.A. insured loans was $724,685 and the excess thereof over Artcraft's cost for the project was $135,798.19. Artcraft did *256 not transfer the full amount of such excess to its four stockholders, as called for by the directors' resolution of February 1, 1946, but instead, transferred only $100,464.98 thereof. And, so far as appears, it transferred to the said individuals no amount representing the excess of the rents or payments received in respect of the said properties up to February 1, 1946, over the $20,000 specified by the directors' resolution of April 1, 1945, or the $90,000 specified by the resolution of February 1, 1946. [6]
*257 The apartment buildings on Tract 11764 and the duplexes on Tracts 11451 and 13163 were, to some extent, of better quality, both in workmanship and in materials used, than the houses therefore built and sold by Artcraft. Pool, for instance, had specified the use of metal lath, instead of plasterboard. The 100 duplexes on Tract 13163 were leased as they were completed, all of the leases being for a period of one year. The dates of completion were in June, July and August of 1945. From time to time, a tenant would inquire as to whether the housing occupied by him under the lease might be purchased. None of the leases carried a purchase option provision, however, and the tenant was advised that the housing was not for sale. The same response was given to nontenants making similar inquiries on various occasions. Effective October 15, 1945, "sales ceilings on all priority assisted housing" were removed, but "OPA controls over rental" remained. At some time in 1945 or early 1946, an application was made by Associates and/or Artcraft for permission to increase the rents being charged on the apartments and duplexes, but the application was denied. As to the 170 duplexes, and upon advice *258 of counsel, a practice was later adopted of not renewing leases when they expired, and thereafter a tenant, upon expiration of his lease, would continue in the premises under a month-to-month tenure. The date of the last of the written leases on any of the 100 duplexes on Tract 13163 was April 10, 1946. Edward Pool and Associates maintained no office as its own and did not purport to have any employees. Its books and accounts were kept by a Mrs. Woodruff, who was carried as an employee of Artcraft, no part of her salary being charged as such to Associates. After the transfer of title to the 22 apartment buildings and the 70 duplexes by Artcraft to its stockholders in 1944, and the similar transfer of title to the 100 duplexes in 1946, the rental of the apartments and duplexes was continued from Artcraft's office and in Artcraft's name. In the leases made, Artcraft was shown as the lessor. As received, the rental payments were deposited in Artcraft's bank account by Mrs. Woodruff, who likewise did the bookkeeping for Artcraft. Artcraft would pay the monthly bills, which included utility bills, bills for maintenance, lawnwork, painting and supplies, by checks drawn on its bank account *259 and would charge the amounts so paid on its books to the account of Associates. At the end of the month, Mrs. Woodruff would draw a check on Artcraft's bank account in favor of Edward Pool and Associates covering the net rentals for the month, or possibly the greater part thereof. This check would be signed by either Pool or Murphy, and would then be deposited by Mrs. Woodruff in Associates' bank account. Also monthly, she would draw four checks in equal amounts, one to each associate, on Associates' bank account. She would usually deliver the checks drawn in favor of Pool and Murphy in person, but would send the checks in favor of their wives through the mail. She would not make these checks for the entire balance in the account, but would leave some amounts to accrue, for the payment of "taxes and insurance and things that came due at the end of the year." A different procedure was followed in the renting of space in the market building and the collecting and handling of the rent thereon. In the leases made, Edward Pool and Associates was shown as the lessor and in keeping therewith the checks for the rent were made payable directly to Edward Pool and Associates, and not to Artcraft. *260 These checks were not deposited in Artcraft's bank account, as was true of the checks covering the rent on the apartments and duplexes, but were deposited directly in the bank account of Edward Pool and Associates. No entries with respect thereto were made on Artcraft's books. Expenditures relating to the market building, such as taxes, were made by checks drawn on Associates' bank account. The handling of the rental checks and the drawing of checks to cover taxes and the like were done by Mrs. Woodruff. As covering services performed by Artcraft as "rental agent" for Associates, "Associates paid Artcraft the following amounts: 1944, $7,745.88; 1945, $9,357.60; 1946, $23,614.44; 1947, $15,500.00; 1948, $12,000.00; 1949, $12,000.00." [7]
*261 After the lifting of the ceiling on the sale prices for war housing in October of 1945, and as veterans returned and began looking for homes, a very substantial upward trend, particularly in 1946, became noticeable in the selling prices such housing was commanding. At some time in January or February of 1946, Philip Boland, who throughout his business life had been engaged in some activity as a real estate broker, was on terminal leave from the Air Force. During that period he was visiting "different people" he knew, among them Pool and Murphy, who showed him the properties they had constructed and then owned. Boland, casually but not seriously, because he did not know where he would locate, suggested that Pool and Murphy permit him to sell the properties for them. The proposal was not accepted. At some time in April of 1946, Boland approached Pool and Murphy in a serious effort to induce them to permit him to sell the apartment buildings and the 170 duplexes. He argued that the then present was the best time to cash in on the property, that everybody wanted to buy but there was nothing to sell, and that the demand was great for any kind of living quarters. Murphy saw it his way, *262 and it was not until later that Pool "more or less reluctantly" agreed to go ahead and sell some of the units, [8] the units then agreed upon being 70 duplexes on Tract 11451. For the services, Boland at first sought the "straight five per cent commission" which was "more or less traditional" in that area. After some discussion, an agreement was reached that the petitioners would supply the office facilities, including telephone and some secretarial and office help, and that Boland should be compensated at the rate of $500 for each building sold. In the course of his negotiations with Pool and Murphy for permission to sell the duplexes, Boland visited the Los Angeles offices of the Bureau of Internal Revenue, and was referred to various rulings and regulations dealing with the sale of the property. He had at one *263 time been an employee of the Bureau. After reading the rulings and regulations, he advised Murphy that in his opinion the gains realized upon the sale of the properties would be capital gains. On some undisclosed date, but after December 31, 1945, the certified public accountant who looked after the books of Artcraft and of Edward Pool and Associates had undertaken to convince Pool and Murphy that they should sell the duplexes and possibly the apartment buildings. Pointing out that they were restricted in the receipt of rental income by rent control, and stating that in his opinion the prevailing prices for such property were at a peak and would not be as favorable thereafter, he argued that the sales proceeds could be put into more favorable income-producing properties. And while the figures disclosed a rather substantial rental income, he made some tabulations which were designed to show that if depreciation should be computed on the current selling prices for such housing, instead of cost, no profit from rental would be reflected. On or about the first of May, 1946, Murphy inquired as to whether the gains upon sale of the properties would receive capital gains treatment. He was *264 taken by the accountant to his senior in the firm, who advised Murphy that the gains would be taxable as capital gains. Boland conducted his selling activities in and from the offices maintained under Artcraft's name, and was assisted in the office and paper work by Mrs. Woodruff. He had no sales assistance in selling the 70 duplexes on Tract 11451, but at one time did employ a girl for work in the office. She was compensated by Boland on his own account. Mrs. Woodruff continued to be paid as an employee of Artcraft and received no compensation from Boland. In selling the 70 duplexes, signs were at first placed in front of buildings which had vacancies in them. After a short time, this practice was abandoned, to the end that people would then come to the office, from which Boland would send them to the places which were vacant, advising them that if they wanted the property, to come back and "we will do business here." Boland wrote the copy for and placed and paid for the advertising in the papers of the area. The duplexes were advertised as having been built by Artcraft and as being for sale by the builder. They were advertised for sale at $11,800 per duplex. Representation was *265 made that "rent of one apartment" would carry "payments on the building." There was no offering, and no sales were made, of any of the 70 duplexes on the basis of single living units; in other words, there was only one buyer for each duplex. The first deposit on a property was taken on May 4, 1946, and in approximately ten weeks' time sales had been closed or deposits had been taken on all 70 of the duplexes. So far as appears, the first closing was on June 22, 1946, and the last on September 6, 1946. The date of closing on one sale is not shown, but the deposit in that instance was made on May 6, and the deed was dated May 28. After concluding his selling activities in respect of the 70 duplexes on Tract 11451, Boland took a trip back to his home in Missouri. He returned to the Long Beach area about the middle of July, and shortly thereafter, reached an agreement with Pool and Murphy for the sale of the 100 duplexes on Tract 13163, which apparently was in all material respects the same as that under which the 70 duplexes had been sold. At or about that time, the selling of such housing was made easier, due to the fact that through so-called GI loans a veteran could borrow the *266 full price of a property and make a cash purchase, without having on his own account to make a down payment. While in the selling of the 70 duplexes each duplex had been sold to a single purchaser, the advertising of the 100 duplexes suggested two purchasers per building, and most of them were so sold. In so making these sales, it was assumed that the Bank of America would do the financing, as it had done in respect of the 70 duplexes. But when application was made for financing the sale of a duplex to two veterans, each to own one-half of the building, the bank declined and the completion of the sales of the duplexes on Tract 13163 had to be delayed until the necessary financing could be arranged. Murphy set about the job of arranging the financing, and was so occupied for a period of several weeks. He "finally arranged for it in the East," and most of the sales were thereafter financed by the Massachusetts Mutual Life Insurance Company. Deposits were taken on 20 duplexes in August, the first shown as having been made on August 12. The date of the first deed was September 23, six being shown for that date. As in the case of the 70 duplexes on Tract 11451, the 100 duplexes were *267 advertised as having been built by Artcraft and as being for sale by the builder. In one instance the representation was, "It's The Builder That's Selling Them!" The price advertised was $13,000 per duplex. The selling operation was conducted in substantially the same manner as in the case of the 70 duplexes, except that Boland, for part of the time at least, employed two salesmen to assist him. As before, the selling was done from the Artcraft office, and he was assisted in the office and paper work by Mrs. Woodruff. Boland paid the salesmen, but Mrs. Woodruff received her pay as an employee of Artcraft. The selling of the 100 duplexes extended through the remainder of 1946 and into 1947. The first closing was on October 23, 1946, and by the end of July 1947, 99 of the transactions had been closed, three being closed in the latter month. Sales of the duplexes would have been facilitated by the existence of vacancies. Due to rent control, however, it was still not possible to have the properties vacated preparatory to sale and in connection with the selling operations the creation of vacancies was encouraged. When the selling of the 70 duplexes on Tract 11451 began, only two *268 units were vacant, but in the course of the selling operations the number increased to thirteen. With respect to the 100 duplexes on Tract 13163, at least 22 units were vacant or became so by the time the sales were concluded. The percentage of tenants who became purchasers was comparatively quite low. In selling the 70 duplexes on Tract 11451, and by months, the deposits were taken, escrow was started, deeds were executed and the transactions were closed, as follows: Trans-
Deposits
Escrow
Deeds
actions
1946
Taken
Started
Executed
Closed
May
55
11
8
June
8
40
37
19
July
5
12
18
38
August
4
7
10
September
1
October
1
1
* 68
** 68
70
*** 69
In selling 99 of the 100 duplexes on Tract 13163, and by months, the deposits were taken, escrow was started, deeds were executed and the transactions were closed, as follows: Trans-
Deposits
Escrow
Deeds
actions
1946
Taken
Started
Executed
Closed
August
20
15
September
27
7
13
October
17
25
28
24
November
14
16
20
11
December
5
14
13
17
1947
January
2
11
13
13
February
1
2
3
18
March
5
1
2
6
April
1
3
2
2
May
2
2
2
June
1
2
3
3
July
3
* 93
** 98
99
99
*269 The 70 duplexes on Tract 11451 were sold for a total of $828,400, 64 being sold at $11,800 per building and 6 at $12,200 per building. The expenses of sale were $45,316.40 and the depreciation, which had been claimed by Associates in its returns of income and, so far as appears, had been allowed by the respondent, was $52,588.94. The 65 duplexes on Tract 13163 sold by Associates in its fiscal year ended January 31, 1947, were sold for a total of $846,250, 60 being sold at $13,000 per building and 5 at $13,250 per building. The selling costs amounted to $42,447.80. The depreciation claimed by Associates as allowed or allowable on the 65 buildings in its return of income for the said fiscal year was $15,314.26. The 34 duplexes on Tract 13163 sold by Associates in the fiscal year ended January 31, 1948, were sold for a total of $442,750, 31 being sold at $13,000 per building and three at $13,250 per building. The selling costs amounted to $23,753.14, and the allowed or allowable depreciation on the 34 duplexes, as shown by Associates on its return for the fiscal year ended January 31, 1948, was *270 $10,592.01. On its return of income for the fiscal year ended January 31, 1947, Associates reported gain of $336,947.98 from the sale of the 70 duplexes on Tract 11451 and $413,372.46 from the sale of 65 duplexes on Tract 13163. [9] It reported a loss of $465.18 on some showcases, and a net gain from the sale of the duplexes of $749,856.26, of which it reported $374,928.13 as the amount of taxable net long-term capital gain distributable to the partners. On its return of income for its fiscal year ended January 31, 1948, it reported a gain on the sale of 34 duplexes on Tract 13163 of $217,354.06 and a loss on the sale of building fixtures retired of $1,537.60, or a net gain from the sale of the said properties of $215,816.46, of which amount $107,908.23 was shown as the amount of taxable net long-term capital gain. Each of the four *271 individual petitioners herein reported on their returns for 1947, and as long-term capital gain, one-fourth of the amount which had been reported by Associates on its return of income for its fiscal year ended January 31, 1947, as net taxable long-term capital gain, and on their returns for 1948, one-fourth of the amount similarly shown by Associates on its return of income for the fiscal year ended January 31, 1948. For the fiscal years ended January 31, 1945, 1946, 1947 and 1948, Associates realized net rentals from the market building, from the apartment buildings on Tract 11674, from the duplexes on Tract 11451, and from the duplexes on Tract 13163, as follows: Year Ended
Market
Tract 11674
Tract 11451
Tract 13163
Total
Jan. 31
Building
22 Multiples
70 Duplexes
100 Duplexes
Income
1945
$ 2,235.17
$ 4,533.55
$ 9,274.23
$ 16,042.95
1946
15,994.60
8,399.10
11,356.05
35,749.75
1947
19,567.18
6,997.97
(3,886.13)
$21,597.29
44,276.31
1948
16,008.70
(2,131.51)
(2,491.07)
11,386.12
$53,805.65
$17,799.11
$16,744.15
$19,106.22
$107,455.13
In 1948 Artcraft built for Pool and Murphy on land owned by them individually *272 a business building, referred to as the bank building. This property was sold in 1952 through a real estate broker, purportedly to avoid possible foreclosure. The fee, if any, paid by Pool and Murphy to Artcraft for constructing the building does not appear. In 1949 arrangements were made with a real estate broker to sell the 22 apartment houses on Tract 11674, and they were sold during the fiscal years 1949 and 1950. Sale of the one remaining duplex on Tract 13163 was completed on February 28, 1949. The gross selling price, cost and net profits from the sales of the 22 apartment buildings were reported by Associates on its returns of income for the fiscal years ended January 31, 1950 and 1951, as follows: Gross sales - fiscal year ended January 31, 1950
$133,938.94
Basis of property sold: Land
$ 12,387.99
Buildings
89,489.49
$101,877.48
Less depreciation
24,459.70
$77,417.78
Commissions paid Real Estate Agent
5,336.29
Loan prepayment bonus
215.00
Escrow costs
917.24
83,886.31
Profit from sales
$ 50,052.63
Gross sales - fiscal year ended January 31, 1951
$171,750.00
Basis of property sold: Land
$ 14,454.98
Buildings
122,022.80
$136,477.78
Less depreciation
36,669.58
$99,808.20
Commissions
7,073.30
Other charges
2,506.51
$109,388.01
Profit from sales
$ 62,361.99
*273 In 1950 Pool and Murphy, in association with Major General Patrick Hurley, formed a corporation in New Mexico, the three individuals being the sold stockholders. The business of the corporation was the building and selling of single-family houses, and in 1951 it built and sold 98 such houses. The houses were sold through brokers. Pool was president and Murphy was secretary-treasurer of the corporation, and their duties were the same as their duties had been with Artcraft. Pool and Murphy each received a salary of $500 per week. In 1951 the three individuals above organized a corporation in Colorado. Its business was the same as that of the New Mexico corporation. At the time of the trial herein, it had built 192 houses for sale and they were in the process of being sold. The positions held with the corporation and the duties performed by Pool and Murphy were the same as those with the New Mexico corporation. From the Colorado corporation, each of them received a salary of $750 per week. "In the audit of the four individual returns for 1944, the revenue agent proposed deficiencies based on his conclusion that the property comprising Tract 11451 and also Tract 11674 had been transferred *274 by Artcraft to its stockholders at an amount less than the fair market value of the property. The difference between the transfer price and fair market value, the revenue agent concluded, constituted a dividend to the individuals. This issue was settled by agreement that the individuals had received a dividend totaling $30,149.36, of which $20,776.82 applied to Tract 11451 and $9,372.54 applied to Tract 11674. The basis of the property was then increased by the individuals by the amount of the dividend for purposes of determining depreciation and gain from the property when sold." [10]
Artcraft had reported in its return for 1944 a net loss of $44,040.09. In its return for 1946, it applied $23,369.86 as a net operating loss carry-over from 1944 and a further net operating loss carry-over of $8,076.15 from 1945 in arriving at 1946 taxable net income. The respondent in his determination of deficiency determined that Artcraft in 1944 had realized income not reported in the amount of $30,149.36, which he determined had been realized "by transferring property to its stockholders for $30,149.36 less than its alleged fair market *275 value." With such additional income, Artcraft's losses from operations in 1944 would have been $13,911.23, instead of the net losses reported, and would have been absorbed as a carry-back to 1943. He likewise determined a net income of $31,480.86 for 1943, as against $18,759.97 as reported by Artcraft on its 1943 return and $13,314.78 as shown by Artcraft's books. As a result of the adjustments so made, the net loss carry-over to 1946 from 1944 and that from 1945 were disallowed. He did allow, however, net loss carry-backs from 1947 and 1948 of $692.92 and $5,008.71, respectively. Also in his determination of deficiency, he determined that the 100 duplexes on Tract 13163 had been transferred by Artcraft to its four stockholders in 1946 for $100,464.98 less than the fair market value of the said property, and that, by reason of such transfer Artcraft had realized ordinary income of $100,464.98, which had not been reported. Without giving effect to the respondent's determination that Artcraft had realized ordinary income of $30,149.36 in 1944 and $100,464.98 in 1946 from transfers of property to its stockholders, Artcraft's income or losses for 1941 through 1946, per its books, were *276 as follows: Year
Amount
1941
$11,705.52 Loss
1942
3,190.15 Net Profits
1943
27,275.34 Net Profits
1944
* 44,060.59 Loss
1945
8,076.15 Loss
1946
** 36,479.00 Net Profits
Artcraft's net profits for 1946, after payment of dividends on the preferred stock and provision for Federal income tax, as per its books, were $34,781.41. In his determination of deficiencies against the four individual petitioners for 1946, the respondent determined that the fair market value of the 100 duplexes on Tract 13163 transferred by Artcraft to them exceeded the "total consideration received therefor" by Artcraft by $100,464.98, and that such excess was income to the petitioners, one-fourth, or $25,116.24, to each. For the years 1947 and 1948, the respondent determined that the gain realized *277 on the sale of the 70 duplexes on Tract 11451 and the 100 duplexes on Tract 13163 was ordinary income, and not long-term capital gain, as reported by them. Beginning with the employment of Boland, the four individual petitioners herein began a business of selling real estate, and from April 1946 the 70 duplexes on Tract 11451, and from July 1946 the 100 duplexes on Tract 13163 were held by them primarily for sale to customers in the ordinary course of that business. Opinion As to Artcraft, the respondent has determined, and now argues on brief, that upon the transfer of the 100 duplexes on Tract 13163 to its stockholders in 1946, it realized gain of $100,464.98, his theory, as we understand it, being that the transfer was a sale of the property by Artcraft to its stockholders for $100,464.98 less than its fair market value; that in an arm's-length transaction Artcraft would have received a price equal to the fair market value of the duplexes, but since the "sale" to the stockholders was not at arm's length, the tax effect was that Artcraft, at least constructively, received market value for the property, thereby realizing gain in the amount determined. As to the stockholders, *278 the respondent's position is that a sale of property by a corporation to its stockholders at less than fair market value effects the payment of a dividend in an amount equal to the excess of the fair market value over the selling price; that such excess in this instance was $100,464.98, and that Artcraft's four stockholders accordingly received dividend payments of $25,116.24 each. The petitioners neither admit nor deny the correctness of the respondent's determination as to the fair market value of the 100 duplexes at the time of their transfer. They do take issue with the proposition that gain is realized by a corporation where it sells property to its stockholders at cost, but at less than its fair market value, and accordingly deny that Artcraft realized gain on the transfer of the duplexes to its stockholders, as respondent has determined. They state, on the other hand, that they "have no quarrel with * * * the theory that a bargain transaction between a corporation and its stockholders is a dividend to the stockholders to the extent of corporate earnings or profits," but "Assuming arguendo that there was a bargain sale by Artcraft to its stockholders" and that the respondent's *279 valuation of the duplexes is correct, it is their position that the amount of the dividend is limited to $34,781.41, or $8,695.35 per stockholder, and that the balance of the excess of the fair market value of the duplexes over the bargain purchase price "first serves to reduce [their] basis in Artcraft stock * * * and the remainder is a long term capital gain," it having been stipulated herein that Artcraft did have net profits of $34,781.41 in 1946, after the payment of dividends on its preferred stock. It is the primary contention of the petitioners, however, that the four stockholders did not acquire the said duplexes by purchase, but that they were built by Artcraft, not for its own account, but for the account of the stockholders, that the building was done by Artcraft for the stockholders pursuant to contract and for a fee, and that for the services rendered the stockholders actually paid Artcraft a fee of $35,333.21, which fee was exactly 6 per cent of $588,886.21, the cost of the project, and thus "establishes that Artcraft received a reasonable fee just as if the contract had been with strangers." In making the above contention, the petitioners make no mention of the *280 fact that it was Artcraft which financed the project, by borrowing the $724,685 on its own account and without personally obligating its stockholders in any manner whatsoever; that though at an early date the stockholders had declared of record that "they were willing to take over title and become the owners" of the 100 duplexes, it was specifically prescribed that they were willing to do so only after the duplexes had been fully erected and completed, and that such taking over and becoming owners must further be subject to the specific conditions that they were not personally or individually assuming any liability for the payment of any amount with respect to such taking over of title or becoming the owners, but only that they should account to Artcraft for so much of the rents and proceeds of sale or other hypothecation of the properties as should be required for the liquidation of the encumbrances on the properties and for which Artcraft and the duplexes remained obligated; and, in addition, were to receive, without obligation, and without restrictions with respect thereto, the overplus of the loan proceeds over the land and building costs, and that they did so receive in cash $100,464.98 *281 of such overplus. As to how the proposition that Artcraft was build-the duplexes, not as principal, but under contract for the personal account of its stockholders, "just as if the contract had been with strangers," is to reconciled with the facts just stated, we are not advised. There is no claim or suggestion of a claim by either party that Artcraft was not at all times a valid and subsisting corporation, and it is patent, we think, that the role of Artcraft was not merely that of building contractor constructing the duplexes for the account of its stockholders for a fee, but rather it was operating for the account of its stockholders in the same manner that the operations of any business corporation are presumed to be for the benefit of its stockholders, and there was, in truth, no building of the duplexes by Artcraft for the personal account of its stockholders. It is likewise patent, we think, that the facts offer no support for the respondent's contention that the transfer of title to the said duplexes by Artcraft to its four stockholders was by way of sale and purchase. The one thing which was at all times made clear was that the four stockholders were to acquire title and *282 become the owners of the duplexes by transfer from Artcraft to them pro rata, [11] and without any personal liability or obligation on their part to pay anything whatever therefor. Such being the case, the end result was no different from any transfer or distribution of property by a corporation to its stockholders pro rata and in their status as stockholders. That a corporation derives no taxable gain from the distribution of assets pro rata among its stockholders is well settled. General Utilities & Operating Co. v. Helvering, 296 U.S. 200. See also United States v. Cumberland Public Service Co., 338, U.S. 451, and Burrell Groves, Inc., 16 T.C. 1163. As to Artcraft, the respondent was accordingly in error in concluding that it had realized a gain upon the transfer of the 100 duplexes to its stockholders. Anent the contention that the four stockholders acquired the duplexes in a bargain purchase, see V. U. Young, 5 T.C. 1251 and 6 T.C. 357, wherein it was held that a bargain sale of property by a corporation to its stockholders does not result in a realization of earnings or profits to the corporation. Eastern Carbon Black Co. v. Brast, 104 Fed. (2d) 460; *283 Choate v. Commissioner, 129 Fed. (2d) 684; and Palace Theatre v. United States, 148 Fed. (2d) 30, cited and relied on by the respondent are not this case. Our conclusion with respect to the transfer of the 100 duplexes by Artcraft to its stockholders in 1946, is also dispositive of the issue relating to the net loss carry-over from 1944, the basic question being whether the transfer by Artcraft to its stockholders in 1944 of the 22 apartment buildings on Tract 11674 and the 70 duplexes on Tract 11451, which transfers, for the purposes here, were in all respects similar to the transfer of the 100 duplexes in 1946, resulted in a realization of gain to Artcraft. As we understand the parties, they are agreed that Artcraft did have the 1944 net loss carry-over contended for *284 unless it realized gain upon the transfer of the said properties in that year to its stockholders. For the reasons given with respect to the 100 duplexes transferred in 1946, we likewise conclude and hold that Artcraft realized no gain or profit in 1944 upon the transfer of the 22 apartment buildings and the 70 duplexes pro rata to its four stockholders. Our next question is as to the Artcraft stockholders, and is whether they each received income of $25,116.24 in 1946 as the result of the transfer to them by Artcraft in that year. For the years herein, the nature and character, tax-wise, of corporate distibutions in the hands of shareholders are prescribed by section 115 of the Internal Revenue Code of 1939, and in section 115(a), a dividend is defined as "any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution *285 was made." And according to section 115(b), "every distribution is made out of earnings or profits to the extent thereof." Section 115(d) relates to distributions which are not dividends and not out of "increase in value of property accrued before March 1, 1913," and provides that any such distribution "shall be applied against and reduce the adjusted basis of the stock * * * and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property." As to the amount of the 1946 distributions by Artcraft, the facts show that the shareholders received $100,464.98, or $25,116.24 each, in cash, and the respondent has determined and claims that they similarly received $100,464.98 pro rata, represented by the excess of the fair market value of the duplexes over $624,220.02, the "price" paid therefor. If the accuracy of this latter $100,464.98 should be a prerequisite to the disposition of the issue under consideration, we would, as the record stands, experience considerable difficulty. We are satisfied, as indicated above, that the transaction whereby the duplexes and the $100,464.98 in cash from the F.H.A. insured loan proceeds were *286 transferred by Artcraft to its stockholders was not a sale, but a corporate distribution pro rata. It would thus appear that the amount of the distribution effected by the transfer of the duplexes would be at least equal to the excess of the fair market value of the duplexes over the amount of the encumbrances to which they were subject at the time of the transfer, since the facts show that the stockholders individually were in no way liable for any amount thereon, but had to account only for the rents and proceeds of sale to the extent of the encumbrances. A difficulty is, however, that while the record indicates that the aggregate of the loans made by Artcraft against the property was $724,685, we are not advised as to the dates of these loans, or as to the payments, if any, which had been made thereon by Artcraft up to the time of the transfer. At first blush, the respondent's determination that the excess of the fair market value of the duplexes over the "price" paid to Artcraft therefor was $100,464.98 might be taken as some indication that the encumbrances to which the properties were subject at time received by the stockholders was $624,220.02. But it now appears that of that *287 amount, $588,886.81 represented land and subdivision and building costs to Artcraft, while the remaining $35,333.21 is listed by the parties in their stipulation as "additional payment by stockholders to Artcraft," and we have heretofore noted that the latter amount was the exact difference between $135,798.19, the overplus of the loan proceeds over Artcraft's costs, all of which, pursuant to the action of Artcraft's board of directors, was to have been distributed to the stockholders, and the $100,464.98 of such loan proceeds which the stockholders actually did receive. On the other hand, it may well be doubted that the encumbrances against the properties had prior to the transfer to the stockholders been reduced by any substantial amount, if at all, since, according to the stipulation of the parties Artcraft had a deficit of $29,816.35 at December 31, 1944, and had sustained a net loss from operations of $8,076.15 during 1945, and aside from the depreciation allowance the excess of the loan proceds over cost represented the only apparent fund which might be available to Artcraft for the purpose of reducing the loans, but of which, as noted, $100,464.98 was transferred to the stockholders. *288 Regardless of these differences, however, and though petitioners have alleged in their petitions, and now argue on brief, that there was no sale of the duplexes by Artcraft to its stockholders since in the construction of the duplexes Artcraft was merely acting as the contractor for the stockholders, for a fee, and under such facts there could have been no corporate-stockholder distribution by Artcraft to its stockholders as the result of the above transfers, they have nevertheless stipulated with the respondent that "the property was transferred to the stockholders for the actual cost to the corporation for the land and improvements plus an additional amount of $35,333.21." And since the petitioners have not contested the respondent's determination that the duplexes had a fair market value of $724,685 at the time of transfer, which is exactly $100,464.98 in excess of "the actual cost to the corporation of the land and improvements plus an additional amount of $35,333.21," there is no basis of record for concluding that the distribution by Artcraft to its stockholders upon the transfer of the duplexes was not at least $100,464.98, as the respondent's determination indicates. Although *289 Artcraft in 1946 had no accumulated earnings or profits from which a dividend might be paid, within the meaning of section 115(a)(1) of the Code, it did have, according to the stipulation of the parties and after the payment of dividends on its preferred stock, 1946 net earnings of $34,781.41, which, under section 115(a)(2), did supply the source from which a dividend in that amount might be distributed in 1946. And, since, as noted, section 115(b) provides that "every distribution is made out of earnings of profits to the extent thereof," it follows that Artcraft did pay a dividend to its stockholders in that year of $34,781.41, or $8,695.35 to each stockholder. And this would be true, even if it be said that the transfer did assume the form of a sale and, as in this case, there was no formal declaration of a dividend. Timberlake v. Commissioner, 132 Fed. (2d) 259. It also follows from the above that the distributions in excess of $34,781.41 are, under section 115(d), to be applied against and reduce the basis to the stockholders of their Artcraft stock to the extent any such basis remained [12] and the excess is taxable "in the same manner as a gain from the sale or exchange *290 of property." George M. Gross, 23 T.C. 576, and Harry Handley Cloutier, 24 T.C. 1006 (filed September 19, 1955). In amount, the deficiencies are, of course, limited by the amounts as determined by the respondent. In the last issue, we have the often quite evenly balanced but constantly recurring question as to whether property which is sold and upon which gain has been realized, was property used in the trade or business of the taxpayer, within the meaning of *291 section 117(j) of the statute, [13] or was a capital asset, within the meaning of section 117(a). And in so many of the cases now being litigated, the question is made no less troublesome and the correctness of the answer thereto is no more or no less certain, whether it be said that it is a question of law, as in Goldberg v. Commissioner, 223 Fed. (2d) 709, primarily or essentially a question of fact, as in Rubino v. Commissioner, 186 Fed. (2d) 304, King v. Commissioner, 186 [189] Fed. (2d) 122, and numerous other cases, or a mixed question of law and fact, such as was under discussion by the Supreme Court, in Dobson v. Commissioner, 320 U.S. 489, the one thing which does appear certain being that "No rigid rule can be formulated by application of which it can be determined in every case with finality whether property sold by a taxpayer was held primarily for sale to customers in the ordinary course of his trade or business, or whether it was sold as a capital asset" and that, in the end, "each case must stand on its own peculiar facts and circumstances." Victory Housing No. 2, Inc. v. Commissioner, 205 Fed. (2d) 317 [371]. *292 We have examined and considered the evidence and have set out in considerable detail the prevailing evidentiary facts which appear to us to be established thereby, and it is our opinion that those facts require the conclusion that the duplexes on Tracts 11451 and 13163 were held by the petitioners primarily for sale to customers in the ordinary course of their business and that they were sold to customers in the ordinary course of that business. As to the original purpose for which the duplexes were held, we are satisfied that it was the intent and hope of Pool to hold them for the production of income through the rental thereof, and that it was with reluctance that he agreed to bring the rental venture to an end and place the 170 duplexes on the market. As to Murphy, however, the record is not so clear. Having observed him in the course of his testimony, taking into account the self-serving character of such testimony and the phrasing of many of the questions to which he responded, we are not persuaded that at any time he had any intent or purpose than to rent or sell the properties, dependent upon which, in the end, should appear to him to be the most fruitful or profitable venture. *293 As to Lottie Pool and Edna Murphy, the record is wholly silent, and aside from any right of the husband to manage the property of the community, it may well be that, in each instance, the purpose and intent of the husband was the purpose and intent of the wife. In any event, however, there can be no question, we think, that the 70 duplexes, for slightly more than two years after distribution by Artcraft, and the 100 duplexes, for some three to six months after distribution, and before being placed on the market, were used in the conduct of a rental business. It is equally clear from the evidence that at some time during the first three months of 1946, and possibly earlier, Murphy began giving attention to the gains and profits to be derived from the sale of the houses, as against their continuation as rental property, and in this he was supported first by the accountant and then by Boland, and to use the words of Pool, "they just finally overrode" him, the result being that in April of 1946, Boland was employed to manage and conduct the sale of the 70 duplexes on Tract 11451, and in July he was similarly employed to conduct the sale of the 100 duplexes on Tract 13163. We do not *294 understand the petitioners to contend that after the agreement with Boland the duplexes were not held primarily for sale, but rather, that they were not held primarily for sale to customers in the ordinary course of their trade or business, their reasoning, as we understand it, being that if the selling operations did constitute the conduct of a business, it was not theirs, but Boland's; that, except as to the routine requirements, such as the making of deeds, they had nothing to do with the selling operations, and that they themselves were merely the passive sellers of investment property looking to the reinvestment of the proceeds, with a view to obtaining a better return thereon. According to the decided cases, the liquidation of property may or may not be the conduct of a trade or business, dependent upon the circumstances and the manner in which the liquidation is accomplished or carried out. Goldberg v. Commissioner, supra; McGah v. Commissioner, 210 Fed. (2d) 769 and 193 Fed. (2d) 662; Home Co., Inc. v. Commissioner, 212 Fed. (2d) 237; Rollingwood Corporation v. Commissioner, 190 Fed. (2d) 263; Curtis Co., 23 T.C. 740, 752; *295 and D. L. Phillips, 24 T.C. 435. And for the same reasons, it does not follow from the fact that the selling was actually done by a real estate broker, rather than by the property owner or owners, that the selling did not constitute a business of the owners or that the sales were not made in the ordinary course thereof. The petitioners themselves, possibly unwittingly, give support to that conclusion. Artcraft, for instance, even though admittedly selling houses in the ordinary course of its business during 1942, 1943 and possibly in 1944, did all of its selling through brokers. It also appears that Pool followed the same course in his individual operations, prior to the organization of Artcraft. See and compare Gruver v. Commissioner, 142 Fed. (2d) 363; Brown v. Commissioner, 143 Fed. (2d) 470 [468]; Welch v. Solomon, 99 Fed. (2d) 41; and Richards v. Commissioner, 81 Fed. (2d) 369, in which case the selling was done by an agent, who was paid a commission, out of which he was to pay for advertising and other selling expenses of himself and his sub-agents. See also James Lewis Caldwell McFaddin, 2 T.C. 395, *296 and Albert Winnick, 21 T.C. 1029, affd. per curiam, 223 Fed. (2d) 266. Certainly it may not be said that the sales here were passive or casual, as they were characterized in D. L. Phillips, supra. See also Victory Housing No. 2, Inc. v. Commissioner, supra. A very aggressive and active sales campaign was carried on. Advertising of the properties for sale was regularly placed in all of the leading newspapers of the area and in at least three instances Boland was successful in having the properties discussed in a news item appearing in the real estate section of Los Angeles papers. The necessary arrangements were made for the financing of the sales on behalf of the customers. For sale signs were at first placed in front of the duplexes in which there were vacancies, and they were taken down only because Boland found that his selling operations could more conveniently and effectively be accomplished by directing that prospective buyers come to the office. In short, all of the usual and normal activities which might reasonably be expected in the conduct of an active real estate selling operation were indulged in. The facts also indicate *297 and establish that the selling operations were not the mere winding up of a business through the sale of properties used therein because the business has proven to be or was no longer profitable, as in McGah v. Commissioner, supra, and Goldberg v. Commissioner, supra. According to the record here, the rental business had been and continued to be a profitable business. Pool had earnestly desired to continue with it. On the other hand, Murphy became convinced that greater profits were to be derived through the marketing of the duplexes. Pool was overridden, gave his consent, and the employment of Boland was the result. The employment arrangement with Boland and the conduct of the selling operations give further support to the conclusion that the petitioners, with the employment of Boland, had launched and entered upon a real estate selling business. Boland had at first sought employment as an independent broker, which would have permitted him to receive the regularly established commission of five per cent on sales. The petitioners apparently were not agreeable to that arrangement, and it further developed that Boland was without office facilities and did *298 not even have, and could not procure on his own account, a telephone in the area. It was accordingly agreed that the petitioners were to furnish him with the office from which the selling operations could be conducted, including the necessary telephone. He was also to receive office help, and was materially assisted therein by Mrs. Woodruff, any and all expenses therefor being provided by the petitioners. Furthermore, when difficulties were encountered with respect to the financing for the prospective purchasers, in connection with the selling of the 100 duplexes on Tract 13163, Murphy personally took over and worked at the matter until the financing had been arranged. The continuity and regularity of sales seem to us to speak for themselves. All of the facts considered, it would be difficult to imagine a selling operation or business which was more actively conducted and carried on than the one here. Many cases have been heard and decided which involved the sale of private housing constructed during the war period. There have been points of resemblance in all of them, and in greater or lesser degrees, there have been points of difference. In some of the cases, either by reason of *299 particular facts or the overall facts, the decision has been that the properties sold were not held primarily for sale by the taxpayers in the ordinary course of their trade or business. In approximately equal numbers, the decisions have been that they were. In Galena Oaks Corporation v. Scofield, 218 Fed. (2d) 217, affirming 116 Fed. Supp. 333, the facts appear to us to be in all essential respects comparable to the facts in the instant cases. In that case, the United States District Court for the Southern District of Texas concluded and held that the properties sold were held by the taxpayer primarily for sale to customers in the ordinary course of its business, and in that conclusion it was affirmed by the United States Court of Appeals for the Fifth Circuit. In our view, the decisions of the courts therein and the reasons expressed therefor offer the strongest support for our conclusion here. In the light of the above, we conclude and hold that the duplexes sold during the taxable years here involved from Tracts 11451 and 13163 were not property used by the petitioners in their trade or business, within the meaning of section 117(j), and as such property *300 is defined in subsection (1) thereof, but were property held by them primarily for sale to customers in the ordinary course of their selling business, within the meaning of section 117(a), and that the gain realized was not capital gain, as claimed, but ordinary income. Decisions will be entered under Rule 50. Footnotes
1. The proceedings of the following petitioners are considered herewith: Edward Pool, Docket No. 36109; Lottie Pool, Docket No. 36110; William K. Murphy, Docket No. 36111; Edna Murphy, Docket No. 36112; William K. Murphy and Edna Murphy, Docket No. 36113; and Artcraft Builders, Inc., Docket No. 36114.↩
2. It was the testimony of both Pool and Murphy that neither Smith nor Cooke desired to engage in the construction of rental housing.↩
3. At this meeting and others at which the transfer of war housing by Artcraft to its stockholders was under consideration, Pool, as president, and Murphy, as secretary, purported to resign as officers and directors of Artcraft, and individuals having no apparent interests in the corporation were purportedly elected to the said offices. Aside from the fact that one of the individuals named was an individual in attendance as counsel for Artcraft, the identity of the purported successors in office does not appear. Immediately after the adoption of the motions indicated, the ritual of accepting purported resignations of the said individuals was indulged in and Pool and Murphy purported to resume their official positions.↩
4. This amount is as shown by the stipulation of the parties. If, however, the amounts (also stipulated) from which this amount is derived are correct, the instant amount should read $47,052.26.↩
5. There is some testimony to the effect that a similar deed covering the said properties was delivered to the four individuals at or about the time of the said directors' meeting.↩
6. It thus appears that the amount representing the excess of the F.H.A. insured loans over the cost to Artcraft of the project, or $135,798.19, exceeded the portion of the loan proceeds distributed by Artcraft to its stockholders, or $100,464.98, by $35,333.21. The stipulation describes an identical amount, $35,333.21, as "additional payment by stockholders to Artcraft." It would accordingly seem that what could have happened was that Artcraft merely retained as its own $35,333.21 of the loan proceeds remaining after paying all of the project's costs and transferring the $100,464.98 to its stockholders. There is some indication from petitioners' proposed findings of fact No. 6 that the $35,333.21, whether it represented an actual payment or merely a retention by Artcraft of a portion of its own borrowings, was in lieu of retention by Artcraft of any part of the rents or payments which had been received by Artcraft in respect of the said properties up to February 1, 1946, the proposed finding being that "Artcraft entered into a contract with Associates on February 26, 1945, pursuant to which Artcraft agreed to build 100 duplexes for Associates. It was agreed that Artcraft was to receive $20,000.00 out of rentals as its fee for building. Associates, however, actually paid Artcraft $35,333.21 for building the 100 duplexes." According to Artcraft's 1945 and 1946 returns, it received during those years as rent $54,787.39 and $9,765.44, respectively.↩
7. This finding is according to stipulation of the parties. There is, however, no showing as to how or on what basis the amounts indicated were fixed or paid. The partnership return of income filed by Associates for the fiscal year ended January 31, 1945, disclosed claimed deductions of $3,369.89 as Office Expense and $9,368.79 as Commissions, Collection Charges, etc. The return for the fiscal year ended January 31, 1946, disclosed deductions similarly designated, of $9,360 and $387.89. On the returns for the fiscal years ended January 31, 1947, 1948, 1949 and 1950, deductions were claimed under the heading of Office Expense of $25,926.94, $14,000, $12,000 and $12,000, and under the heading of Rental Commissions of $425.70, $558.30, $576.28 and $517.21.↩
8. It was Pool's testimony that Murphy got rather enthusiastic as the prices went up, but that he, Pool, still didn't want to sell them. He also testified, "We got so much advice from Mr. Boland, Mr. Boland was so persistent on what they could do, the prices he could get, and naturally there was quite a profit on them, and they just finally overrode me, that's all."↩
*. Two dates of deposit are not shown. ↩
**. Two dates escrow started also are not shown. ↩
***. One date of closing is not shown.↩
*. Six dates of deposit are not shown. ↩
**. One date escrow started also is not shown.↩
9. In reporting the gain from the sale of the 100 duplexes on Tract 13163, Associates used $624,220.02 as its cost of the said duplexes, this amount representing: ↩
Land and Subdivision Costs to
Artcraft
$ 63,013.81
Building Cost to Artcraft
525,873.00
"Additional Payment by Stock-
holders to Artcraft"
35,331.21
$624,220.02
10. The quoted paragraph is from the stipulation of facts.↩
*. This amount is from the stipulation. The $20 difference indicated by reference to the loss reported on the 1944 return is not explained. ↩
**. This figure does not show certain minor adjustments which have been made to correctly reflect income per the books, or the amounts distributed to Artcraft's stockholders as dividends on preferred stock, amounts of Federal income tax paid.↩
11. Mathematically the transfers lacked a very small fraction of one per cent of being pro rata. The deed was made to the four stockholders "as tenants in common, each owning an undivided one-fourth interest" in the properties, whereas the Class B common stock was held 14,050 shares by the Pools and 13,950 by the Murphys. Each couple owned 2,000 shares of the Class A preferred stock.↩
12. The parties have stipulated that the cost basis of the Artcraft stock in the hands of the four stockholders was $32,000. They have likewise stipulated that in 1944 Artcraft distributed to the four stockholders in cash $48,052.26, representing the overplus of the F.H.A. insured loans on Tract 11451 over the land and subdivision and building costs thereon. The record also shows that the respondent determined that at the time the apartment buildings on Tract 11674 and the 70 duplexes on Tract 11451 were transferred by Artcraft to the four stockholders in 1944, the fair market value of the apartment buildings and the 70 duplexes exceeded the "price" at which they were transferred by $30,149.36.↩
13. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer * * * or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.↩