D. L. PHILLIPS, PETITIONER, *v.* COMISSIONER OF INTERNAL REVENUE, RESPONDENT.

D. L. AND LOUISE E. PHILLIPS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 48289, 48290. Filed June 22, 1955.

---

*Frank McCleneghan, Esq., F. T. Miller, Esq.,* and *W. C. Davis, Esq.,* for the petitioners.

*Alben E. Carpens, Esq.,* for the respondent.

438

OPINION.

FISHER, *Judge:* Respondent determined that gains realized by petitioner from real estate transactions during the years 1947 through 1949

are taxable as ordinary income from the sale of property held by him primarily for sale to customers in the ordinary course of his trade or business. In his return for each of the years in question, petitioner reported such income as capital gains, and he herein assigns as error respondent's determination to the contrary. The issue presented therefore is whether at the time of sale petitioner held each item of property "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of that phrase as used in sections 117 (a) (1) and 117 (j), Internal Revenue Code of 1939. As has been frequently stated, this ultimate issue is essentially a factual one dependent upon the precise facts of the particular case under consideration. See *Curtis Co.*, 23 T. C. 740, and cases cited therein at page 750.

In the instant case, during the years in question, petitioner was engaged in many facets of the real estate business. He bought and sold both developed and undeveloped land. He was a general contractor and constructed for himself and others houses, apartments, and other buildings on land owned both by himself and by others. He also held real estate (in his own name and in the names of corporations controlled by him) for rental and other investment purposes. In our findings it is demonstrated that during the years 1944 through 1951 petitioner's largest source of annual income fluctuated considerably from year to year between rentals, construction contracts, and sales of real estate. Under these circumstances, it is clear that petitioner was both a dealer and an investor in real estate, a dual role which we have previously recognized. See *Walter R. Crabtree*, 20 T. C. 841, and *Nelson A. Farry*, 13 T. C. 8. Accordingly, in deciding the ultimate issues in the instant case, we must determine as to each transaction whether the disposition was of property held primarily for sale in the ordinary course of business or of property held as an investment.

During the taxable years, petitioner disposed of some of his income-producing properties as well as some vacant and unimproved pieces of real estate. We turn first to a discussion of the latter.

During the taxable years, petitioner sold vacant lots and lots upon which he had constructed houses in the Chantilly Subdivision. 354 lots in the subdivision (which was then well established) had been acquired in 1937 by a joint venture of which petitioner was a member for the purpose of further improving the land and holding it for sale. Homes were constructed on some of the lots by petitioner pursuant to contracts with their respective purchasers. After 1940, petitioner acquired the interests of the other joint venturers and continued to sell lots in the quantities set out in our findings and to build houses under contracts with individual purchasers.

In 1946, a corporation controlled by petitioner procured transferable commitments for F. H. A. mortgage insurance on 90 houses to be

built in Chantilly. Thereafter petitioner constructed and sold over 90 houses in addition to selling many vacant lots during the years in question. Petitioner reported in his returns for the taxable years the sales of all lots as sales of capital assets held for more than 6 months and the profit on building the houses as income from his trade or business.

During the taxable years petitioner also disposed of a number of pieces of vacant real estate under the following circumstances: (a) Scotland Hills, a tract in Charlotte acquired in 1947 and developed into a subdivision of 182 vacant lots by petitioner, was sold at a profit in 1948 to a corporation controlled by petitioner for which he thereon erected 182 houses to be held for sale by that company; (b) the Belk tract in Charlotte was acquired in 1948 and portions of it were thereafter sold at a profit by petitioner; (c) a vacant portion of B tract in Jacksonville acquired in 1943 was sold by petitioner in 1948 to a Buick dealer for commercial purposes; and (d) a number of vacant lots in Overbrook Subdivision were sold by petitioner during each of the taxable years.

It is our view that the Chantilly properties and the above items of vacant realty were acquired and held by petitioner at all times pertinent hereto primarily for sale to customers in the ordinary course of his business as a real estate dealer. We stated the applicable principle in *Curtis Co., supra* (p. 755), as follows:

However, the essential fact seems to be that these properties were acquired for the purpose of resale whenever a satisfactory profit could be made. Petitioner may not have aggressively promoted the sale of these properties; but, nevertheless, the frequency and volume of its sales of undeveloped real estate and its substantial holdings of such properties convince us that these properties were held, not only for sale at some time in the future, but primarily for sale to its customers in the ordinary course of its business during each of the years here in issue. Petitioner was a dealer in undeveloped land, and gains derived from the sale of such property are taxable as ordinary income.

Petitioners contend that the sales of Chantilly properties were ancillary to the construction business, but, since petitioner was for many years in the business of selling properties in Chantilly, we deem it immaterial that some were sold during the taxable years in connection with construction contracts. In this respect the instant case is clearly distinguishable from *Dunlap* v. *Oldham Lumber Co.*, (C. A. 5, 1950) 178 F. 2d 781, and *W. T. Thrift, Sr.*, 15 T. C. 366, cited by petitioner.

Petitioners also contend that the other properties mentioned above were held by petitioner primarily for investment purposes. Our view to the contrary with respect to Scotland Hills and the Belk tract, both of which were vacant at the time of the transactions here involved, requires no further discussion. B tract and Overbrook, how-

ever, were in part then used for income-producing purposes, and some further discussion of the sales of vacant land therein is warranted.

The B tract in Jacksonville consisted of various parcels acquired by petitioner during the years 1942 through 1948. Petitioner improved and held some of this tract for investment purposes, i. e., apartments, motor court, and supper club building. Some of the land, however, remained vacant, and in 1948 petitioner sold a vacant lot to a Buick dealer. Similarly, in the Overbrook subdivision petitioner constructed houses for rental purposes on some of the land, but he also sold 22 vacant lots in the subdivision during the years in question. As a dealer in real estate, such vacant land was part of petitioner's stock in trade. Moreover, there is no convincing evidence that he was holding vacant pieces adjacent to his investment properties for any purpose other than resale whenever a profitable proposition might be presented to him. Under these circumstances we are convinced that the vacant realty in tract B and Overbrook were, like the Chantilly properties and the other vacant realty mentioned above, held by petitioner primarily for sale to customers. Cf. *Curtis Co., supra.*

As previously stated, during the years in question petitioner was an investor in income-producing property as well as a dealer in real estate. The remaining transactions to be discussed herein concern sales of some of his income-producing properties. We hold that these properties were held by petitioner for investment purposes at the time of their respective sales, and were not held primarily for sale in the ordinary course of business. The reasons for our views with respect to these transactions are set out below.

In 1949, petitioner sold a farm in Carteret County, North Carolina, to a paper manufacturing corporation which had approached him about buying it, apparently for its timber value. Petitioner had acquired this 1,400-acre farm in 1944 as a farm and timber investment. He thereafter attempted to rent the farm. Petitioner also had hopes that oil in commercial quantities might be discovered there, but oil explorations did not prove successful. Under these circumstances, we are convinced that this farm was held by petitioner for investment purposes and not primarily for sale in the ordinary course of business at the time of its disposition in 1949.

We now consider the sale of houses in Overbrook Subdivision in Jacksonville. Petitioner originally became interested in this project in 1942 at the suggestion of F. H. A. officials who were attempting to procure the erection of single-family houses for rental purposes near Camp LeJeune. Thereafter, petitioner acquired vacant land and, through a corporation controlled by him, acquired F. H. A. commitments for 100 houses to be erected thereon for rental purposes. The houses were completed in 1943.

Although petitioner was thereafter authorized under F. H. A. regulations to sell one-third and later all of the rental housing units, for a time he refused to sell any of them despite repeated offers by some tenants. In October 1944 and April 1945, however, he did sell houses to two tenants who had repeatedly sought to make purchases. No sales were made thereafter until the last half of 1946 when three houses were sold to persons who approached the subdivision manager, petitioner's brother, for that purpose.

We are convinced by the above circumstances that the Overbrook houses were originally erected and held by petitioner as an investor in income-producing real estate. Moreover, in view of the few houses sold, despite authority to sell some or all of them, accompanied by a heavy demand for housing during that period, it seems clear that petitioner was holding the houses primarily for investment purposes, at least until August 3, 1946, when the first of many subsequent sales took place.

It was during the last part of 1946 that petitioner advised his brother that Overbrook houses could be sold if interested buyers appeared, but that he, petitioner, was then in no hurry to sell. By that time, the houses, which were of frame construction, were beginning to require extensive repairs due in part to the brackish water in the vicinity. About that time also petitioner acquired a millwork plant in Charlotte and he was purchasing machinery and equipment necessary for its operation. Moreover, there was then a great demand by tenants, former servicemen, and marines stationed nearby to purchase houses in Overbrook. Accordingly, petitioner decided to allow tenants and others to buy houses in Overbrook. A decision to sell investment property, however, does not alone establish that it is thereafter held primarily for sale in the ordinary course of a business. In this respect, we stated in *Curtis Co., supra* (p. 752) :

It has frequently been stated that, in determining whether the gain derived from the sale of real property is entitled to capital gains treatment under section 117 (j), the test which deserves greatest weight is the purpose for which the property was held during the period in question. *Walter R. Crabtree, supra.* This holding period does not terminate upon the decision to sell but extends until the project is actually sold. Naturally, once a decision has been made to sell investment property, such property is thereafter held for sale. However, this does not preclude the application of section 117 (j) since the critical issue is whether it is held for sale by the seller "in the ordinary course of his trade or business." To obtain capital gains treatment under section 117 (j), a taxpayer may choose the most advantageous method of liquidating his investment in properties originally acquired and held for investment purposes, so long as such method of disposal does not constitute his entrance into the trade or business of selling such properties. It may be more expeditious to enter such business in order to dispose of investment properties; but once this is done, the benefits of section 117 (j) are lost.

Accordingly, in the instant case, in reaching our ultimate conclusion, we must give consideration to the manner in which the houses were sold. See *Home Co. v. Commissioner*, (C. A. 10, 1954) 212 F. 2d 637, 641, affirming a Memorandum Opinion of this Court.

During the years 1947 through 1949, petitioner sold, respectively, 54, 22, and 14 Overbrook houses. Petitioner's brother represented him at each of the closings. Many of these houses were sold to the same persons who had occupied them as tenants, and only vacant houses were sold to persons other than tenants. In connection with the sales, no advertising was employed, no "For Sale" signs were displayed, no real estate agents represented petitioner, and no sales promotion was undertaken. It is our view that the sale of rental property under such circumstances did not convert investment property into property primarily held for sale in the ordinary course of business.

In *Frieda E. J. Farley*, 7 T. C. 198, the petitioner was a nursery owner who sold 25½ lots from his property for residential purposes during one taxable year under circumstances analogous to those in the instant case. In holding that the sales were not made in the ordinary course of a business, we stated in part as follows (p. 202) :

the method of selling the property in lots, we think, was determined by the purchasers rather than by petitioner. Although taking no active steps to sell the property, petitioner was approached by individual purchasers seeking small residential lots. These unsolicited approaches were what lent the element of frequency and continuity to the sales. Petitioner might have eliminated the frequency and continuity of the sales by selling the entire tract in one piece. It is not improbable, however, that to interest an individual or group of individuals in a purchase of such magnitude would have required more elements of business activity than did petitioner's acceptance of individual offers as they occurred from time to time. Under these circumstances, it appears to us that the frequent and continuous character of the sales resulted notwithstanding petitioner's passivity rather than from any business activity on his part. * * *

We believe that in the case at hand, as in the *Farley* case, *supra*, petitioner maintained a passive role, and that the frequent and continuous character of the sales likewise resulted notwithstanding that passivity rather than from any business activity on his part. Although there is evidence that in at least one instance in 1948 petitioner's brother advised a tenant that the house he occupied was for sale and that he had first chance to purchase it, such action is consistent with petitioner's decision to sell the houses under the circumstances above described, and does not establish that he thereupon held them primarily for sale in the ordinary course of business. This view is equally applicable to the one occasion in 1947 when the brother sold a house rather than rent it to a prospective occupant.

The passive nature of petitioner's activities in the sale of Overbrook houses is emphasized by comparing them with his activities in liquidating other investment properties about the same time. In 1946, in one

transaction, petitioner sold at a profit all 30 duplex houses (60 rental units) in a defense housing project owned by him in Burlington, North Carolina. This transaction was arranged by a real estate agent representing the purchasers without any solicitation on petitioner's part. He reported the gain on his 1946 return as long-term capital gain.

On the other hand, a corporation controlled by petitioner which owned the Scotland Hills development of 182 houses sold them individually in 1950 and 1951 in the course of aggressive sales activities which included using agents to promote sales. The parties agree that the corporation correctly reported the profits from such sales as ordinary income in its return for each of those years. Petitioner's activities in conducting a sales business are aptly demonstrated by the aggressive actions connected with the sale of Scotland Hills houses. It is our view, however, that petitioner was no more active in selling each of the Overbrook houses individually than he was in selling the entire Burlington development in one transaction.

We have also noted that after the taxable years petitioner still owned five of the Overbrook houses. Three of them were sold in 1950 and the remaining two in 1951. Thus, it took about 5 years for petitioner to sell out Overbrook completely after he had indicated his willingness to sell. This period of time is consistent with a comparatively gradual and passive liquidation of investment property as distinguished from the operation of a business of selling houses, particularly in view of the housing shortage which respondent himself contends made selling activities superfluous at that time. We noted such circumstances in the *Farley* case, *supra*, as follows (p. 203) :

We are further impressed by the fact that the sales in question appear to have been essentially in the nature of a gradual and passive liquidation of an asset. We appreciate that the so-called liquidation test has been rejected in certain cases wherein the manner of conducting the alleged liquidation was such as to constitute a trade or business. * * * It is undoubtedly true that where the liquidation of an asset is accompanied by extensive development and sales activity, the mere fact of liquidation will not be considered as precluding the existence of a trade or business. Where, however, the active elements of development and sales activities are absent, the fact of liquidation is not, in our opinion, to be disregarded. The liquidation factor has been given consideration and weight in such cases as *United States* v. *Robinson*, 129 Fed. (2d) 297 ; *Fuld* v. *Commissioner*, 139 Fed. (2d) 465 ; *Harriss* v. *Commissioner*, 143 Fed. (2d) 279.

In *Walter R. Crabtree*, *supra*, we were concerned with a real estate dealer and broker who was also an investor. During 1943 and 1944, he constructed a defense housing project of 148 units of which 54 were sold upon completion. 45 others were sold in 1944. The gain from such sales was reported as ordinary income. Beginning late in 1945, petitioner sold the remaining 49 houses of which 16 were sold in 1945 and 33 in 1946. Other than the 54 houses which were sold upon completion, the houses were all held by petitioner prior to their sale for

rental purposes. We held, in effect, that the 1945 and 1946 sales constituted the liquidation of investment property and that the profit therefrom was to be taxed at capital gains rates. In this respect, we stated as follows (p. 848) :

In the instant case, to reach the conclusion for which respondent contends would be tantamount to saying that a dealer in real estate could never sell a defense-housing project and accord capital-gains treatment to such profit as may arise therefrom. To so hold would be a clear usurpation of the legislative prerogative. For nowhere does respondent point to nor can we find any evidence of Congressional intent to treat dealers in real estate, who sell investment property, differently from dealers of another sort. In *Carl Marks & Co., supra,* we allowed a security dealer in 1941 to take from his dealer's account certain securities and place them in an investment account. The following year, more securities were added to the investment holdings. The holdings in each account were carefully separated as were accounting entries pertaining thereto. In 1942, when some of the investment holdings were sold, we allowed capital-gains treatment of the profits therefrom. We see no such clear dissimilarity in that case and this, except in the kind of property dealt in, to warrant our according capital-gains treatment in the one and not the other.

In the instant case, as in the *Crabtree* case, *supra*, petitioner is an investor in real estate who sold some of his investment property at a profit but who thereafter retained substantial real estate holdings (and subsequently increased them) for investment purposes. In both cases, the taxpayers played passive roles in connection with the solicitation of sales. In view of these and other similarities, we believe that *Walter R. Crabtree, supra*, is controlling in the instant case. See also *Delsing* v. *United States*, (C. A. 5, 1951) 186 F. 2d 59, and *Nelson A. Farry, supra*.

Our holding above that the vacant lots in Overbrook were held by petitioner primarily for sale is not inconsistent with our contrary view with respect to the houses. As stated above, vacant lots in general were a large part of petitioner's stock in trade as a real estate dealer. In the absence of evidence to the contrary, the sales of vacant lots in Overbrook at a profit during the years 1946 through 1951 are persuasive evidence that they were held primarily for that purpose at all times. The Overbrook houses, on the other hand, had been held by petitioner for rental purposes for a number of years prior to their sale, and a proper analysis of the circumstances surrounding their sale leads to a result differing materially from that relating to sales of vacant land which was not held for investment purposes.

Petitioner has pleaded that the deficiency determined for the taxable year 1947 is barred by limitations since the statutory notice for that year was mailed to petitioner more than 3 years after the date of filing the 1947 return. Respondent, however, contends that, because petitioner improperly reported his income from real estate transactions as capital gains, he therefore omitted 50 per cent of that income from the gross income stated in the return; that this amount (plus

certain depreciation adjustments) exceeded 25 per cent of the gross income stated in the return; and that the statutory notice was thus timely because it was mailed within 5 years of the date of filing the 1947 return. See sec. 275 (c) of the 1939 Code. Specifically, respondent contends that petitioner reported a gross income of $181,790.86 in his 1947 return, and that he failed to report as gross income $96,770.51 which exceeded $45,447.72, or 25 per cent of the reported gross income.

Assuming *arguendo* that reporting ordinary income as capital gain constitutes an omission from gross income within the meaning of section 275 (c), we nevertheless hold, in the light of our determination that the sales of Overbrook houses were properly reported by petitioner in his 1947 return, that respondent has not established that an amount in excess of 25 per cent of the gross income stated in the return was omitted therefrom. Sales other than Overbrook houses resulted in total profit to petitioner in 1947 of $82,446.58. See schedule A of our findings. Assuming that petitioner reported all such profits improperly as long-term capital gains instead of ordinary income as contended by respondent, petitioner's omission of 50 per cent thereof from his return for that year amounted to only $41,223.29, which did not exceed the required amount ($45,447.72, according to respondent's view) for extending the period of limitation to 5 years. We hold, therefore, that respondent's determination with respect to 1947 is barred by limitations and there is no deficiency for that year.

In view of the above holding, it is unnecessary to consider whether transactions other than the sales of Overbrook houses in 1947 resulted in capital gains or ordinary income to petitioner.

Other issues in the instant case are dependent upon those decided above and will be disposed of under Rule 50.

*Decisions will be entered under Rule 50.*