Paul M. Nehring v. Commissioner.
Nehring v. Commissioner
Docket No. 54320.
United States Tax Court
T.C. Memo 1957-51; 1957 Tax Ct. Memo LEXIS 203; 16 T.C.M. (CCH) 224; T.C.M. (RIA) 57051; March 28, 1957
*203 Edward M. Gerrity, Esq., for the petitioner. Andrew Kopperud, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $15,323.30 in petitioner's income tax for 1950. The sole issue for decision is whether or not certain 300 ohm television twin lead-in wire purchased and sold by petitioner in 1950 was a capital asset within the meaning of section 117(a)(1) of the Internal Revenue Code of 1939. Findings of Fact Petitioner resides in DeKalb, Illinois, and during the year 1950 his residence address was 335 College Avenue in that city. His Federal income tax return for the year 1950 was timely filed with the collector of internal revenue for the first district of Illinois. The notice of deficiency herein was mailed to petitioner on May 28, 1954. Petitioner is a college graduate and manjored in physics and chemistry and had courses in banking and finance. Since 1935 he has been employed full time by Nehring Electrical Works, a corporation located in DeKalb, Illinois, which has been engaged for more than 30 years and was engaged during the year 1950 in the manufacture and sale of bare and weatherproof *204 textileinsulated copper wire and cable, and steel reinforced cable, primarily for the use of public utilities. During 1950, petitioner was a director, officer, shareholder, and chief production engineer of the corporation and received from it in that year a salary of $20,000 and dividends of $10,000. Petitioner personally maintained his own financial records and prepared his own tax returns for the years 1949 through 1953 although he had had only limited training in accounting. He did not seek professional advice in connection with the preparation of his returns. Prior to 1949, petitioner, as a sole proprietorship under the name of DeKalb Electronics Co. (hereinafter referred to as DeKalb), commenced the purchase of an extrusion machine, other equipment, supplies of plastic compounds, and related items. During 1949 and 1950, DeKalb owned the following machine and equipment which on December 31, 1950, were located at 100 Augusta Avenue, DeKalb, Illinois, in a shop maintained by petitioner: Cost Acquired
Cost Acquired
Total Cost
Asset
1948-1949
1950
12/31/50
Extrusion machine #1 and attachments
$7,807.85
$ 455.76
$ 8,263.61
Steam Boiler for processing and heating
924.01
924.01
Dies for extrusion machine
247.32
332.78
580.10
Tools
167.94
167.94
Production Measuring equipment
437.50
2,834.79
3,272.29
Furniture and fixtures
215.25
456.12
671.37
$9,799.87
$4,079.45
$13,879.32
*205 Petitioner, as DeKalb, purchased the foregoing equipment and the plastic compounds and wire described below for the purpose of doing research and conducting experiments on various plastic compounds to evaluate their usefulness in wire, solids, rounds, tubes, and other uses to which they might be suited. The measuring equipment was for the purpose of testing inductance, capacity, resistance, tensil strength, elongation, and similar characteristics of the compounds. Petitioner was primarily interested in evaluating the commercial usefulness of the various plastic compounds in the production of various forms and shapes of insulated wire. He made test runs in which he produced a sufficient quantity of experimental wire to acquire the particular information he was seeking. The minimum cost of a test run was approximately $100 and, in the course of this experimenting, petitioner produced a number of varieties of television lead-in wire which differed in size, shape, and other characteristics, although some of it approached 300 ohm. During 1949, petitioner did this work himself in his spare time, but in 1950, due to his increased traveling, he hired a part-time assistant to clean the equipment *206 between test runs and to make necessary adjustments. Printed Schedule C, entitled Profit (or Loss) from Business or Profession, of petitioner's individual Federal income tax return for 1949 was as follows: (1) Nature of business: Manufacturing Coaxial Cable (2) Business name: DeKalb Electronics Co.
(3) Business address: 417 N. First St. 1. Total receipts
None
Cost of Goods Sold
(to be used where inventories are an
income-determining factor)
2. Inventory at beginning of year
$1,515.10
3. Merchandise bought for sale
8,030.31
4. Labor
296.09
5. Material & Supplies
125.44
6. Other costs
7. Total lines 2 to 6
9,966.94
8. Less inventory at end of year
6,434.25
9. Net cost of goods sold (line 7 -
line 8)
3,532.69
10. Gross profit (line 1 less line 9)
(3,532.69)
Other Business Deductions
11. Salaries and wages
12. Rent
$1,800.00
13. Interest on business indebted-
ness
14. Taxes on business and business
property
15. Losses
16. Bad debts arising from sales or
services
17. Depreciation, obsolescence and
depletion
1,857.13
18. Repairs
278.27
19. Other expenses
1,477.21
20. Net operating loss deduction
21. Total lines 11 to 20
5,412.61
22. Total lines 9 & 21
8,945.30
23. Net loss
($8,945.30)
*207 Certain items in the above schedule consisted of the following: Item
Consisted of
Inventory at begin-
Plastic materials for
ning of year
tests to be run by De-
Kalb Electronics Com-
pany
Merchandise bought
Approximately 95 per
for sale
cent plastic and a
small portion of wire
Inventory at end of
Approximately 99 per
year
cent plastic and a very
small portion of wire
There were no sales made in 1949 by DeKalb and the item "cost of goods sold" reflected the expenses of getting the equipment into operation, of experimental runs, and of making various tests. No attempt was made to sell the experimental products. Although the nature of the business was described as "manufacturing coaxial cable," none was manufactured in 1949 or thereafter. The business of DeKalb was more accurately described on Schedule C of petitioner's 1950 Federal income tax return as "plastic moulding and extrusion." During 1950 petitioner purchased plastic compounds of various types and colors from the following suppliers in the aggregate amount of $61,976.92: Supplier
Total Cost
Bakelite Division of Union Car-
bide & Carbon Corporation
$21,001.50
A. Bamberger Corporation
3,094.30
Freight
51.20
E. I. Dupont De Nemours &
Company
6,582.26
Gering Products, Inc.
3,740.70
B. F. Goodrich Chemical Com-
pany
27,506.96
Total pounds of plastic com-
pounds purchased in 1950 -
119,285 pounds
Total cost of plastic compounds
purchased in 1950
$61,976.92
*208 The invoices for the above amounts of plastic compounds were all addressed to Nehring Electrical Works and all material was shipped to it. It had an unloading dock and when petitioner was away this material would be set aside for him to pick up on his return for transfer to 100 Augusta Avenue, where he was conducting his experiments. All payments for the compounds were by checks of Paul M. Nehring or of DeKalb, signed "Paul M. Nehring, Jr." In addition to the plastic compounds, DeKalb also purchased 22,789 1/4 pounds of bare wire from Nehring Electrical Works for $11,340.20, making its total purchases for 1950 $73,317.12, which amount was reported on Schedule C of petitioner's 1950 Federal income tax return. Although the wire produced by DeKalb was produced as a by-product of petitioner's experimental work, such wire in 1950 was in critical demand and petitioner was able to sell the usable plastic-covered wire so produced for $49,858.27, as follows: Purchaser
Amount
Admiral Corporation
$ 4,212.15
Allied Radio Corporation
150.00
B & K Manufacturing Co.
600.00
Central Television Service
650.00
Drake Manufacturing Co.
25,162.33
General Cement Co.
2,154.00
C. H. Johnson
1,800.00
H & H Electronic Supply Inc.
150.00
Hatry & Young
300.00
Micarta Fabricators, Inc.
1,208.89
Morts Radio Shack, Inc. of Chi-
cago
320.00
Newark Electric Co.
360.00
Radio Distributing Co.
1,050.00
Radio Television Supply Corpora-
tion
300.00
Sievert Distributing Co.
490.00
Trio Manufacturing Co.
150.00
Webster Chicago Corporation
1,147.75
Nehring Electrical Works
9,653.15
Total wire sales
$49,858.27
*209 In addition to the above, DeKalb sold plastic compound for $3,000 to Jersey Specialty Co. and miscellaneous items to another person for $50. Sales in the total amount of $52,908.27 were invoiced by DeKalb and reported on Schedule C of petitioner's 1950 Federal income tax return. The sales to Nehring Electrical Works were reflected in credit memoranda issued by it to DeKalb. Petitioner made no effort to sell the wire produced during his experimental test runs. He hired no agents or salesmen, but the shortage of such wire was sufficiently great to cause buyers to seek him out for what usable wire he could sell. Petitioner kept a separate set of records for DeKalb consisting of a series of accounts showing its sales, purchases, payments for expenses, accounts payable, and accounts receivable. A separate bank account was opened in the name of DeKalb Electronics Co. on or about April 4, 1950, and the cancelled checks and statements were retained for its records. The equipment in DeKalb's shop was adequate for petitioner's experiments but was inadequate for the efficient commercial production for sale to customers of the various types of plastic insulated wire which petitioner produced *210 in his test runs. During October 1950, petitioner purchased 1,150,000 feet of 300 ohm twin lead wire (finished television lead-in wire) at a cost of $15,892.42. Details concerning these purchases are shown in the following table: Date of
Invoice
Price
Shipment
Number of
per
Sales
1950
Description
Feet
M Feet
Price
Freight
Total
From: Atlantic Wire and Cable Corporation,
254 Huron Street, Brooklyn, N. Y.: 11/6
300 ohm twin lead
100,000
$14.35
$1,435.00
$ 29.20
11/10
300 ohm twin lead
150,000
14.35
2,152.50
38.93
Total purchased from Atlantic
Wire and Cable Corporation
250,000
$3,587.50
$ 68.13
$ 3,655.63
From: Jersey Specialty Company,
Little Falls, New Jersey: 11/13
Television Leadin Wire
100,000
$12.00
$1,200.00
$ 35.54
11/21
Television Leadin Wire
100,000
12.00
1,200.00
35.54
11/27
Television Leadin Wire
100,000
12.00
1,200.00
35.54
12/4
Television Leadin Wire
100,000
12.00
1,200.00
33.99
12/18
Television Leadin Wire
100,000
12.00
1,200.00
33.99
Total purchased from Jersey
Specialty Company
500,000
$6,000.00
$174.60
$ 6,174.60
From: Phalo Plastics Corporation,
25 Foster St., Worcester 8, Mass.:
Net Freight
11/30
Brown 300 ohm T V Lead
& Wire Charges
#22007E
220,000
$12.70
$2,795.27
($ 32.85)
12/1
Brown 300 ohm T V Lead
(27.75)
#22007E
180,000
12.70
2,286.00
102.49
Cost of 1802 lbs of #22 7 Strand
of.010 3/4inch lay copper wire
and freight thereon a
939.03
Total purchased from Phalo
Plastics Corporation
400,100
$5,081.27
$980.92
$ 6,062.19
Total # of feet of wire pur-
chased
1,150,100
Total cost of wire purchased
$15,892.42
*211 Petitioner purchased this wire with the intention of holding it for investment purposes for at least 6 months. He felt that it soon would be in short supply and that there would be a price advance. He had never before purchased television wire in a finished condition. This was his only purchase of completed insulated wire. The purchased wire was billed to Nehring Electrical Works apparently because of its credit rating as compared to petitioner's, and was shipped to it because of the dock facilities for unloading it. Nehring Electrical Works was listed in the customary credit reports and had a top rating. Petitioner was not individually listed and in placing orders for the wire he found that having the orders placed in the firm's name aided in their acceptance by distant suppliers. Petitioner set up a separate bank account for the purchased wire transaction. He made payment for the wire and freight charges by checks *212 in his own name on the First National Bank in DeKalb, drawn to the vendors and to the shipping company. The checks were drawn on both a special account petitioner set up for what he considered to be "personal capital transactions" and upon his regular personal account. Petitioner did not process the purchased lead-in wire in any way and did not change the quantities on the spools. The wire was held in the warehouse of Nehring Electrical Works which was located about a mile from the place where petitioner conducted his experimental activities. All of this wire was set aside and was not mingled with any other material or supplies. Petitioner maintained separate records of the transaction in the wire consisting of folders in which he kept purchase records consisting of invoices from his suppliers and a second folder which held petitioner's copies of his sales invoices, bills of lading, summary of checks received from the firms to which he sold the wire, and deposit slips. The amounts shown on the copies of the deposit slips were deposited in a special account in the First National Bank of DeKalb under the name "Paul Nehring, Jr." The account was set up separately, primarily for the *213 purpose of segregating the receipts from the sale of the television lead-in wire. Petitioner's personal bank account was entitled "Paul M. Nehring." At the time he ordered the wire, petitioner did not intend to resell it upon delivery but intended to hold it against an increase in the price. He was of the opinion that the Korean war situation, the increase in television set production, and the possible imposition of Government controls would result in an increase in the stockpiling of wire components by manufacturers, and that this, in turn, would cause an appreciation in the price of the wire. Petitioner also considered and weighed the risk that the production of television sets would be curtailed by Government regulations. The result of his evaluation of the various factors was his decision to speculate on the purchase of 1,000,000 feet of television lead-in wire. Shortly after petitioner purchased the wire, the Korean war situation, as reflected in the Chicago papers, changed and it appeared to petitioner that the fighting would soon be over. Petitioner began to think that he had made a mistake in buying the wire. A good deal of his information came from news articles he read *214 in the Chicago Tribune. The changing war situation, its effect on the civilian economy, and its probable effect on the price of the wire were the dominant factors in inducing petitioner to alter his plans and to sell the wire soon after making his purchases. Petitioner did not advertise the wire for sale and did not hire anyone to sell it for him. While he held the wire, a number of persons called him seeking to buy it, and when he decided to dispose of it he sold it to people who called him. The people who called him did so on the basis of rumors that he had wire available or knew of a source. So many people requested petitioner to sell them the wire that he decided to sell it in several transactions rather than in one bulk sale. He sold to those who offered the highest price for the quantity. The wire was sold and shipped in the name of Paul Nehring, Jr. Four of the vendeees (Admiral, Central Television, General Cement, and Sievert Distributing) had purchased experimental wire previously from DeKalb. Admiral was the only one of the four that subsequently bought wire from DeKalb. During the year 1950, petitioner sold in his own name, using his home address of 335 College Avenue, *215 DeKalb, Illinois, all 1,150,000 feet (less 1,000 feet lost in transit) of the television lead-in wire in the same condition in which he had received it for the aggregate sum of $39,519.50. The sales were made through 15 invoices to 11 vendees and petitioner realized a net gain of $23,627.08 on the sale of the purchased wire, none of which was held for more than 6 months. Although he repored only a portion of the gain, based on cash collections in that year, as a short-term capital gain for 1950, petitioner now concedes that the entire gain regardless of the time of collection should have been reported as part of the claimed capital gain for 1950. Details concerning these sales are shown in the following table: Date of
Invoice
Price
Shipment
Number of
per
Sales
Total
1950
Description
Feet Sold
M Feet
Price
Sales
To: Admiral Corporation.
3800 Cortland Street, Chicago, Illinois: 12/14
300 ohm Polyethylene lead wire
30,000
$30.00
$ 900.00
12/16
300 ohm Polyethylene brown lead wire
370,000
30.00
11,100.00
12/27
Polyethylene lead wire
100,000
30.00
3,000.00
$15,000.00
To: Allen Merchandise Co.,
1206 N. Wisconsin St., Racine, Wisconsin: 11/20
300 ohm twin lead wire, black polyeth-
ylene
15,000
$30.00
$ 450.00
450.00
To: Central Television Service.
3730 N. Southport, Chicago 13, Illinois: 11/20
300 ohm twin lead, black Polyethylene
20,000
$30.00
$ 600.00
600.00
To: General Cement Mfg. Co.,
919 Taylor Street, Rockford, Illinois: 11/20
300 ohm twin lead, black Polyethylene
wire
30,000
$30.00
$ 900.00
12/11
151,000
30.00
4,530.00
5,430.00
To: E. J. Gustafson Co.,
Wilson Terminal Bldg., Sioux Falls, South Dakota: 11/25
300 ohm black twin lead wire
40,000
$50.00
$ 2,000.00
2,000.00
To: Mid West Associated,
506 Walnut Street, Rockford, Illinois: 12/11
100,000
$30.00
$ 3,000.00
3,000.00
To: Radio Specialty Appliances,
829 N. Broadway, Milwaukee, Wisconsin: 12/4
300 ohm black Polyethylene wire
50,000
$45.00
$ 2,250.00
2,250.00
To: Schmiers Distributing Co.,
225 18th Street, Rock Island, Illinois: 12/6
300 ohm twin lead wire
10,000
$45.00
$ 450.00
450.00
To: Sievert Distributing Co.,
1415 W. Mitchel, Milwaukee, Wisconsin: 11/20
300 ohm twin lead black Polyethylene
10,000
$30.00
300.00
300.00
To: T & H Engineering Co.,
Kirkland, Illinois: 11/25
300 ohm brown and black twin lead wire
100,000
$45.00
$ 4,500.00
4,500.00
To: Williams, Inc.,
828 S. Adams Street, Peoria, Illinois: 12/7
300 ohm twin lead wire
50,000
$45.00
$ 2,250.00
12/22
300 ohm Polyethylene wire
73,100
45.00
3,289.50
5,539.50
Total # of feet of wire sold
1,149,100
Total Sales Price of wire sold
$39,519.50
*216 The purchased 300 ohm television lead-in wire was not stock in trade of petitioner or other property which would properly be included in his inventory if on hand at the close of the taxable year, nor was it property held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Petitioner, on January 1, 1950, had a capital loss carry-over from capital transactions of the year 1945 in the amount of $14,036.38, and short-term capital losses for 1950 in the amount of $400.25, making a total of available capital losses for the year 1950 of $14,436.63. He had no capital gains for 1950 other than from the sale of the purchased 300 ohm television lead-in wire. The stipulation of facts and the exhibits annexed thereto are incorporated herein by this reference. Opinion KERN, Judge: The sole issue herein is whether or not certain 300 ohm television twin lead-in wire purchased and sold by petitioner in 1950 was a capital asset within the meaning of section 117(a)(1)(A) of the Internal Revenue Code of 1939. [1] If we conclude, as we have concluded, that this wire was a capital asset, then its sale resulted in the realization by petitioner of a short-term *217 capital gain of $23,627.08 which would be partly offset by a capital loss carry-over of $14,036.38 from transactions in 1945 and short-term capital losses of $400.25 in 1950. In order for petitioner to prevail, he must prove that the wire was neither (a) "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year," nor (b) "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Petitioner is a stockholder, director, officer, and chief production engineer of Nehring Electrical Works, *218 a corporation which for more than 30 years has been engaged in the manufacture of bare and weatherproof textile insulated wire primarily for the use of public utilities. During 1949 and 1950 petitioner, under the name DeKalb Electronics Co., conducted experiments in his spare time with various plastic compounds as insulating material for television wire. His experimental activity included the test-run production of a number of types of electric wire insulated with various plastic compounds. During 1950 petitioner received many requests for the insulated wire produced in his test runs since equivalent wire was in short supply. He sold the usable portion of the insulated wire to those who sought him out and applied the proceeds to reduce the cost of his experiments. In October 1950 petitioner held the belief that the Korean war situation was such that 300 ohm television twin lead-in wire would soon be in short supply because of an anticipated stockpiling by manufacturers of television equipment. Petitioner, therefore, determined to make a speculative investment in approximately 1,000,000 feet of this wire and hold it for a considerable period of time against an expected appreciation *219 in the price. He entered into purchase agreements covering the acquisition of 1,150,000 feet for $15,892.42 from three suppliers. He testified that these purchase agreements were made by telephone within a few minutes of 1 day. By November the war situation, as petitioner assessed it in the light of the information he was able to obtain from a reading of the Chicago Tribune, had so changed that petitioner feared he had made a mistake and decided to dispose of the purchased wire. Thereupon, during November and December 1950, he sold all the wire (with the exception of 1,000 feet lost in transit) in the same condition in which he received it to 11 vendees through 15 invoices at a total price of $39,519.50. Respondent has determined that the gain of $23,627.08 realized by petitioner in 1950 upon the sale of the purchased television lead-in wire was ordinary income and not short-term capital gain from the sale of a capital asset. He contends that: 1. The 300 ohm television wire purchased by petitioner was held by him primarily for sale to customers in the ordinary course of his trade or business. In support of this ground, respondent argues that: (a) Petitioner purchased the wire *220 with the sole intention of reselling it, hence negating any investment purpose. (b) Petitioner sold most of such wire to customers already obtained by his sole proprietorship, DeKalb Electronics Co., and by Nehring Electrical Works. Little sales effort was required because of the sellers' market created by the critical shortage of 300 ohm wire. (c) Petitioner was purchasing and selling the wire simultaneously, transacting all purchases and sales within a 7-week period as shown by the table set forth in our findings of fact, with particular reference to the dates of the invoices described therein. (d) Petitioner's sales under his individual name and under his business name of DeKalb Electronics Co. were of substantially the same kind of wire and mainly to the same customers, and his individual sales were merly a continuation of his business firm's sales which he reported as ordinary income. 2. The 300 ohm wire purchased by petitioner was property which would properly be included in his inventory if on hand at the close of the taxable year. The purchased 300 ohm television wire was the same as was manufactured by petitioner's DeKalb Electronics Co. which used an inventory at *221 the beginning and end of the years 1949 through 1951 and the income of which was reported on the accrual basis. After careful consideration of all of the evidence before us, we have reached the conclusion that the 300 ohm television twin lead-in wire purchased and sold by petitioner in the period October through December of 1950 was neither stock in trade nor property held primarily for sale to customers in the ordinary course of petitioner's trade or business, and, consequently, that such wire was a capital asset within the meaning of section 117(a)(1)(A). [2]
We are convinced that petitioner's purchase of the television wire was for the purpose of a speculative investment and had no relation to his employment as chief production engineer of Nehring Electrical Works or to his experimental activities under the name of DeKalb Electronics Co. except to the extent such activities may *222 have provided him with the training, experience, and knowledge of firms in the industry which enabled him to conceive the idea for and to carry out such investment. The evidence has established to our satisfaction that petitioner in his operations as DeKalb Electronics Co. was engaged in research and experimental test runs evaluating the commercial usefulness of various plastic compounds as insulating material for electric wiring. The facilities of the little shop thus operated by petitioner in his spare time were not suited to the economical commercial production of plastic insulated wire for sale to customers, and we do not believe petitioner was so engaged. It appears to us that sales of the experimental wire constituted purely a salvage operation for the purpose of reducing the cost of the experiments to petitioner. However, we need not decide whether the sales of experimental wires by petitioner operating as DeKalb were sufficiently frequent, continuous, and substantial to warrant the conclusion that petitioner was engaged in the business of holding such experimental wire for sale to customers in the ordinary course of his business. The purchased television wire with which we *223 are concerned in this case was segregated from the experimental wire; separate records were kept of its purchases and sales; a special bank account was opened for the television wire transaction; purchases were paid for by checks drawn by petitioner individually and not under the name DeKalb as were payments for the purchases for the experimental activities; and the invoices were made out in petitioner's name and not in the name of DeKalb as were the invoices covering the sale of the experimental wire. The purchased wire was all of one type, while the experimental wire consisted of a variety of sizes, shapes, and colors, and had varying characteristics. Even if petitioner, as DeKalb, was engaged in business, it was possible for him to be an investor with respect to the purchased wire, and we hold that he was such. D. L. Phillips, 24 T.C. 435; Walter R. Crabtree, 20 T.C. 841; Nelson A. Farry, 13 T.C. 8. Respondent's argument that the purchased wire was stock in trade of petitioner or property of a kind which would properly be included in his inventory if on hand at the close of the taxable year is only valid if we find that the purchase of the *224 television wire was a part of DeKalb's activities, which we are unable to do, or if the purchase and sale of the television wire constituted a business in which this wire was stock in trade or property includible in inventory. The authority relied upon by respondent in support of the latter point, Simonsen Industries, Inc., 26 T.C. 515, is distinguishable. In the cited case a syndicate took several years to dispose of a quantity of music wire and piano wire, and determined its gross profit at the end of each year by the use of inventories and prepared its tax returns on the accrual accounting and inventory basis. Petitioner herein disposed of his purchased wire within approximately 2 months and had no need to resort to the use of inventories or to the accrual basis of tax accounting. The venture was separate from his activities as DeKalb, and the method of tax accounting for his research activities and for the sales of the experimental wire have no bearing on the issue. Turning to the respondent's major contention that the purchased wire was held primarily for sale to customers in the ordinary course of petitioner's trade or business, we are faced with the obvious fact *225 that petitioner did purchase the non-income-producing television wire for eventual resale. However, this fact alone does not prevent the wire from being a capital asset. The statute requires the sales to be in the ordinary course of petitioner's trade or business. Dunlap v. Oldham Lumber Co., ( C.A. 5, 1950) 178 Fed. (2d) 781. In George R. Kemon, 16 T.C. 1026, we pointed out the distinction between a dealer and a trader in connection with the purchase and sale of securities, and we feel that this distinction may also be appropriately used in the instant case. We said therein that a dealer was one who purchased property for resale to customers he had or hoped to have for a price in excess of his cost, the premium representing his compensation for acting as a middleman. A trader, on the other hand, we said, was one who purchased property with the expectation of reselling it after a rise in the value during the interval of time he held it, and who performed no merchandising function for which he sought compensation since his source of supply was not significantly different from that of those to whom he eventually sold the property. Bearing the above distinction *226 in mind, we see no reason why the purchased wire should not be classed as a capital asset merely because petitioner had to sell it eventually in order to realize any return. Speculative investments in non-income-producing property have previously received capital gain treatment. E. R. Fenimore Johnson, 19 T.C. 93; Thomas E. Wood, 16 T.C. 213; W. T. Thrift, Sr., 15 T.C. 366; Ben L. Carroll, 21 B.T.A. 724; Williamson v. Bowers, ( D.C., S.C., 1950) 120 Fed. Supp. 704; Weaver v. Henslee, ( D.C., Tenn., 1954) 120 Fed. Supp. 707. We have noted the fact, damaging to petitioner, that the dates of invoices of the various shipments overlap the period during which he commenced selling the wire. Petitioner contends that he purchased all of the wire from the three sources named in the foregoing list in October and within a few minutes through telephone calls, and that the dates of the invoices represent the dates of the partial shipments in fulfillment of his completed purchase contract. Thus, he says, he was not buying new wire at the same time he asks us to believe that he had changed his mind about the prospects *227 of his venture prompted by stories in the newspapers. We have examined the invoices and the shipping company's bills of lading, and we have noticed that some are marked "partial shipment" and that others have the same date for "invoice date" and "date to be shipped", indicating the probability that the order was placed in advance of that date. All things considered, we accept petitioner's sworn testimony that he had contracted to purchase all of the wire before he changed his mind about holding it for 6 months or more and began to sell it. The only remaining problem is whether in liquidating his investment in the purchased wire petitioner entered into the business of holding it primarily for sale to customers in the ordinary course of his business. D. L. Phillips, supra; Curtis Company, 23 T.C. 740, revd. (C.A. 3, 1956) 232 Fed. (2d) 167; Louis Greenspon, 23 T.C. 138. In Arthur E. Wood, 25 T.C. 468, at page 473, we set out the oft-repeated general principles which have guided us in similar situations: "While resolution of the issue here presented involves essentially a factual determination, the courts, in considering *228 this question, have pointed out the most important factors to be utilized in determining whether property at the time of sale was held primarily for sale to customers in the ordinary course of business. The considerations to be given the most weight in such cases include the original purpose of the taxpayer in acquiring the property, the purpose for which it is held at the time of sale, the frequency, continuity and substantiality of sales, and the extent of sales activity on the part of the seller or his agents by improving the property, advertising and soliciting purchasers. Dunlap v. Oldham Lumber Co., 178 Fed. (2d) 781; W. T. Thrift, Sr., 15 T.C. 366." We have already determined that the petitioner's purpose in acquiring and holding the wire was as a speculative investment. His purpose in disposing of it was to liquidate his investment at a profit and before an anticipated drop in price due to his belief that there had occurred a change in the war and business situation upon which the original purchase had been predicated. All of the wire was disposed of between November 20, 1950, and December 27, 1950, a period of some 5 1/2 weeks, to 11 different *229 vendees through 15 separately-invoiced transactions. This limited number of sales in so short a time, in complete liquidation of an investment, does not impress us as having the requisite degree of frequency or substantiality to support a finding that the property was being held for sale to customers, and it certainly does not have the continuity one would expect for an "ordinary course of business." Petitioner made no effort to sell the purchased wire but, after deciding to dispose of it, he began to accept the offers of potential purchasers who called him from time to time on the possibility that he did have wire for sale. We are of the opinion that petitioner's activities in liquidating his investment were not such as to convert the wire into property held primarily for sale to customers in the ordinary course of his business. Thomas E. Wood, supra; W. T. Thrift, Sr., supra; Frieda E. J. Farley, 7 T.C. 198. The cases relied upon by respondent are distinguishable. In Simonsen Industries, Inc., supra, Morris W. Zack, 25 T.C. 676, cited therein, and Arthur E. Wood, supra, the taxpayers engaged in extensive *230 sales efforts and activities over a long period of time. In J. Roland Brady, 25 T.C. 682, the taxpayers never held the property passively for investment purposes but were actively engaged in purchasing lots encumbered by tax liens, disencumbering them, and reselling them as quickly as possible. The facts in the instant case are far removed from any of those cited and relied upon by respondent. Decision will be entered under Rule 50. Footnotes
a. This quantity of wire was shipped to Phalo Plastics Corporation by Nehring Electrical Works on 11/17/50 as vendor. Paul M. Nehring agreed to pay these charges and Phalo Plastics Corporation priced its shipment of covered wire to him proportionately lower.↩
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
2. The fact that we have reached this conclusion is not to be considered as constituting an approval of all the contentions advanced in petitioner's reply brief. To the contrary, we note our disapproval of its intemperate language and deprecate its criticisms directed against respondent's counsel.↩