Robert G. Elbert and Marian Bourne Elbert v. Commissioner.
Elbert v. Commissioner
Docket No. 56088.
United States Tax Court
T.C. Memo 1957-108; 1957 Tax Ct. Memo LEXIS 144; 16 T.C.M. (CCH) 449; T.C.M. (RIA) 57108; June 27, 1957
David W. Richmond, Esq., 1001 Connecticut Avenue, Washington, D.C., for the petitioners. John R. Moodie, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the income taxes of the petitioners as follows: Year ended
Deficiency
October 31, 1948
$33,189.81
October 31, 1949
151.34
October 31, 1950
3,535.97
$36,877.12
The only issue to be decided is whether losses sustained by petitioners on the sale of certain parcels of real *145 estate in 1948 and 1950 resulted from the sale of capital assets as determined by respondent, or from the sale of properties held by them for sale to customers in the ordinary course of business, as contended by petitioners. Other adjustments made by the respondent with respect to the petitioners' returns for their fiscal years ended October 31, 1948, October 31, 1949, and October 31, 1950, were either conceded by the petitioners or were not assigned as error in their petition. Findings of Fact Some of the facts have been stipulated by the parties. The stipulation and exhibits attached thereto are incorporated herein by this reference. The petitioners Robert G. Elbert and Marian Bourne Elbert (sometimes hereinafter called Robert and Marian) are husband and wife residing at Manhasset, New York. They filed timely joint income tax returns for the fiscal years ended October 31, 1948, October 31, 1949, and October 31, 1950, with the collector of internal Revenue for the third district of New York. Before the first World War Robert was in the hotel business, associated with prominent persons in that industry. During that war Robert served in the Air Force. Prior to the petitioners' *146 marriage in 1922, and subsequent to the first World War, Robert had been engaged in the real estate business as a salesman in an enterprise involving the construction of a large cooperative apartment house in New York City, and the sale and rental of apartments therein, although at no time has he ever held a real estate license. Shortly before their marriage Marian inherited a substantial fortune in cash and a trust fund from her father who, at the time of his death, was worth approximately $40,000,000. The income from the trust was reported in the petitioners' returns for the taxable years here involved. In the taxable years petitioners' income from this source was $242,682, $334,506, and $242,682. After his marriage to Marian, Robert worked for a short time in the real estate department of Peabody, Hoteling & Company. During the 1930's Robert served in Washington, D.C., as a member of a number of Government boards and agencies. During this period he contracted tuberculosis which disabled him for about a year. Robert went into the Air Force in World War II and served therein as an intelligence officer throughout the war. In February 1923 Marian purchased 71.98 acres of land in Manhasset, *147 New York. At the time of the purchase of this tract, which was known as the Elbourne tract, there was an uncompleted house on the property. This house was completed subsequent to the purchase in 1923, and has been used by the petitioners as their residence. After the purchase of the tract Robert quit his job with Peabody, Hoteling & Company. In 1924 Marian purchased 9.494 acres of land immediately adjoining the Elbourne tract and known as the Spreckels tract. This property (the Spreckels tract) and other properties adjacent to the Elbourne tract later purchased by petitioners were acquired by them pursuant to an idea of Marian's that they should get additional land contiguous to Elbourne, with a view to subdividing it and building houses for sale, as her father had done, prior to her marriage, in connection with a home he had built on Long Island. Marian had volunteered her advice to her father and his architect in connection with this project, especially in connection with the planning and decoration of the houses built upon the subdivision. Marian's continuing interest in real estate ventures was shown by her purchase (assisted by Robert in the negotiations) of an old house on *148 Long Island in 1922, which they had seen while motoring. She felt she could make something of it since it was well built although dilapidated and needing repairs, and purchased it for $86,000. After making repairs at a cost not shown by the record, she sold it the next year for $125,000. In 1926 she bought another place on Long Island for $60,000, and after she had "fixed it up, and landscaped it, and everything" at a cost not shown by the record, sold it the next year for $126,000. Both of these houses were sold through brokers and were real estate speculations of Marian, not related to the real estate venture contemplated by petitioners in connection with the land which they acquired adjacent to the Elbourne tract. In 1924 Robert employed an attorney, James H. Purdy, who acted as legal and financial adviser to the petitioners in connection with their real estate transactions. In December 1924 Robert caused the Deved Realty Corporation (hereinafter called the corporation) to be formed under the laws of the State of New York. The corporation had a paid-in capital of $250,000, which was given to Robert by Marian. Robert was its president and sole stockholder. In April 1926 the name *149 of the corporation was changed to "Oakbourne Corporation." Robert continued as president and sole stockholder of the corporation until its dissolution in 1934. In February 1925 the corporation purchased 49 acres of land in Manhasset, New York. This tract was known as the Poole tract and joined the Elbourne tract to the south. In April 1925 the corporation purchased 50.6318 acres of land in Manhasset from the Thorne estate, which acreage was known collectively as the Thorne tract and consisted of 3 separate parcels of land and was adjacent to and south of the Poole tract. In March 1926 the corporation purchased 6.361 acres of land in Manhasset known as the Warren tract, which was located adjacent to and south of the Thorne tract. In 1928 Marian purchased 43.5 acres of land known as the Emanuel tract adjoining and immediately to the north of the Elbourne and Spreckels tracts. In 1929 Marian purchased 93.8342 acres of land known as the Munsey tract adjoining and immediately to the north of the Emanuel tract. This property was purchased from the Metropolitan Museum and its acquisition completed petitioners' real estate holding in this immediate area, and extended petitioners' property *150 (approximately 325 acres) from Northern Boulevard - the main thoroughfare from New York - to a road on the south which would lead to Mineola. In April 1933 to corporation exchanged 2-acre tracts of land with the American Nursery Company. In 1934 the corporation was dissolved and its real estate holdings were transferred to Robert. The corporation during its existence made no sales of real estate. However, in 1930 and 1931 the corporation conveyed approximately 10 acres of land from the Thorne and Poole tracts to the Long Island Park Commission for construction of a parkway and the approaches thereto. The corporation received no payment for the conveyance but was to have a voice in locating the parkway. The petitioners also reserved rights-of-way for access roads. After the dissolution of the company in 1934, the ownership of the petitioners' Manhasset real estate was all in either Robert's name (95 acres) or in Marian's name (approximately 219 acres). During the 1930's petitioners, their attorney, James H. Purdy, and others (including two real estate brokers) explored the possibilities of subdividing and developing the Manhasset property. A plan of development of the Munsey tract *151 and an adjoining tract not owned by the petitioners, but available for purchase, was drawn up in 1932. Plans were made for its landscaping and estimates were submitted covering the cost of this landscaping and also grading and the installation of utilities. Attempts were made to secure financing for the proposed development from the Reconstruction Finance Corporation and private banks, but all were without success. The financing requested was an initial advance of $1,500,000 and a reserve credit of $1,000,000. In 1938 a plan of subdivision and development of the entire real estate holdings of Marian at Manhasset, excluding the homestead, was drawn up. The plan as drawn up conflicted with zoning regulations in the area with regard to a relatively small part of these holdings. A suit was brought to have the regulations modified but was not pressed to a conclusion because the coming of the war made it impossible to proceed with the development as planned. In 1936 Robert borrowed money from Marian and purchased 10 acres of land in Port Washington, New York, known as the Littleton tract. A realty corporation, called Purdell Realty Co., Inc., was formed to subdivide and develop this tract. *152 Robert was president of this corporation and received the corporation's stock in exchange for the property. A development organization, consisting of an architect and builder, real estate man, and engineer, was formed which could later be available in any development of the Manhasset property. From June 1936 to October 1944, Purdell Realty Co., Inc. sold 24 lots from the subdivision together with 12 houses which the corporation had constructed thereon. This corporation maintained a sales office on the property and an address at 570 Lexington Avenue, New York City, which was also the address of the law office of Purdy, the treasurer of the corporation. Purdy had direct contact with the purchasers of the property and also supervised the entire development. Marian took a great interest in the affairs of this development and gave helpful advice with regard to the design and landscaping of the houses. In October 1944 this corporation was dissolved and the 5 vacant lots owned by it were transferred to Robert. He sold 3 1/2 of these lots in 1947 and the remaining 1 1/2 lots in 1949. He reported the gain from the 1947 transaction as ordinary gain and the gain from the 1949 transaction as long-term *153 capital gain. By 1938 it was apparent that the development organization at Port Washington was not working out as the petitioners expected it would, and they asked Purdy to look for a bigger development organization which would go into a joint venture with the petitioners. The petitioners cleared the Manhasset land along Northern Boulevard and erected signs advertising that the property was suitable for development and requesting inquiries. Purdy also solicited offers from developers who were working on Long Island, including McCallin Brothers, Lamont, Leavitt & Sons, Winston, and others. The propositions which resulted from this activity, however, were not acceptable to the petitioners because the developers wanted to purchase the land outright from petitioners and were not willing to have the petitioners participate in the development profits. By 1940 Leavitt & Sons had acquired a tract of land adjacent to the Manhasset land of petitioners and known as the Metropolitan Museum tract, and had started a development there and on the nearby Vanderbilt property. The petitioners tried to interest Leavitt in a joint venture proposition, but he was too big to consider a joint venture, *154 and only made an offer to purchase part of Marian's land. In 1940 Marian sold the 93.8342-acre Munsey tract to Leavitt & Sons and 46.1907 acres of the Emanuel and Elbourne tracts to the Macjoseph Corporation. The petitioners believed that to have Leavitt develop the property along Northern Boulevard would help them in their efforts to develop the rest of their property. Marian particularly did not want the development to start along the road and then die, and the sale of a large tract to Leavitt and Macjoseph insured that the development would extend well back from the road, thus opening up the rest of petitioners' property for development. The petitioners planned to connect with the Leavitt roads and expected to benefit from his sales efforts. The development by Leavitt and Macjoseph was a development of highpriced private homes back from the road and stores and other business buildings on Northern Boulevard and was similar to the original development plan prepared for the petitioners in 1932. Following the war, the petitioners changed their approach with respect to developing the rest of the Manhasset property. Because the petitioners had no building organization at this time, *155 they decided to subdivide the remaining property into 2-acre lots and sell them to individuals for building sites. Purdy saw a number of real estate brokers and informed them that if they had persons interested in building houses on 2-acre tracts the petitioners would plan the development to give them what they wanted. In 1948 Robert sold 20.23 acres from the Poole tract and Marian sold 12 acres from the adjoining Elbourne tract to George Bayer. This property was sold as a single parcel, although a larger tract was subdivided in order to fit this parcel into the petitioners' development plan. These two sales resulted in losses of $10,108.83 and $40,086.19, which the petitioners deducted as ordinary losses rather than as capital losses, but now concede are in the respective amounts of $11,002.78 and $33,546.94. In 1949 Robert sold to Russell Young 2 acres from the Poole tract, including a residence on the property. Also in 1949, he sold to Frank Arendt 3.0162 acres from the Poole tract. These sales were solicited by brokers at the request of the petitioners. Gains from these two sales were reported as long-term capital gains. In 1950, Robert sold two lots of 2 acres each from the *156 Thorne tract to L. R. Rubin. This sale resulted in a loss which was reported as an ordinary loss, but is now conceded to be in a lesser amount than that claimed, i.e., $1,118.51. The petitioners also acquired real estate in South Carolina. About 15,500 acres of land known as the Airy Hall Plantation were purchased during 1928, 1929, 1930, and 1933. The petitioners purchased the Airy Hall Plantation with the intention of converting it into a private shooting club. These plans never materialized and Marian sold the property in 1941. The title to this property was transferred from Robert to Marian by deed in October 1939. Marian bought 6 acres of land together with a private residence in Aiken, South Carolina, in April 1941. In May 1941 she bought a farm known as the Guernsey Farm consisting of 1,478.3 acres also in Aiken, South Carolina. She sold the 6-acre tract of land in 1944 and the Guernsey Farm in 1948. In June 1944 she bought 10 acres of land known as the Rutherford estate in Aiken, South Carolina. In 1950 she gave this estate to a Catholic girls' school. In 1948 Robert contracted bronchial pneumonia and Marian became the victim of arthritis which in time disabled her. After *157 they were advised by their doctors to go to Florida for their winters they purchased in 1949 an unimproved lot at Miami Beach, Florida, which was sold the same year without improvement. In 1949 they purchased a house and 2 lots in Florida. One lot was sold and the remaining house and lot is used by petitioners as their winter home. The property in question was held by the petitioners in 1948 and 1950 for sale to customers in the ordinary course of their trade or business. The losses sustained by the petitioners from the sale of these properties in 1948 and 1950 were attributable to the operation of a trade or business regularly carried on by them. Opinion KERN, Judge: The sole issue in this case is whether the losses sustained by petitioners from the sale of real property in Manhasset, Long Island, New York, in 1948 and 1950 were ordinary losses incurred in the petitioners' trade or business and deductible in full under section 23(e)(1), Internal Revenue Code of 1939, or were capital losses from the sale of capital assets deductible under the provisions of section 117, Internal Revenue Code of 1939. The petitioners' position is that they were in the real estate business and that *158 the property was being held by them primarily for sale to customers in the ordinary course of business. The respondent contends that the petitioners' real estate purchases and sales of their "New York, South Carolina, and Florida properties were not of such frequency, continuity and substantiality as to justify a finding that selling real estate was petitioners' business." The general question involved is one of the most litigated in the Tax Court. It is essentially a question of fact. D. L. Phillips, 24 T.C. 435. In resolving such a question many factors have been considered by this Court and other courts. We said in W. T. Thrift, Sr., 15 T.C. 366, 369: "The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers and advertising. * * *" No one factor is necessarily decisive. Each case must be decided in the light of all *159 pertinent factors and particularly the facts of the individual case. W. T. Thrift, Sr., supra. The test which deserves the greatest weight is the purpose for which the particular property was held during the period in question. Walter R. Crabtree, 20 T.C. 841. While the facts in this case are neither complicated nor in dispute, they present a question which is close and troublesome. We reject as unreal and not supported by the facts petitioners' contention that they were engaged generally in the real estate business during the taxable years and prior thereto so that any and all sales of real estate in New York, South Carolina, or Florida must be considered as sales of property held by them primarily for sale to customers in the ordinary course of business. Petitioners were persons of great wealth with a very large annual income derived from a trust created by Marian's father. Both were interested in real estate and throughout the years had engaged in various real estate ventures. However, the relative amount of time, energy, and capital devoted by them throughout their lives to these real estate projects is and has not been such as to justify a conclusion *160 on our part that they should be characterized as being in the general business of dealers in real estate. However, the question remains as to whether they were in the real estate business during the taxable years with regard to the Manhasset properties from which the sales here in issue were made. As to this specific property, we think the petitioners were in the real estate business and that the losses incurred during the taxable years were in connection with this business and from the sale of property held by them primarily for sale to customers in the ordinary course of that business. The uncontradicted testimony is that this property was purchased not for a long-term investment but for the purpose of subdivision, development, and sale in small parcels; that elaborate and expensive plans and estimates were made for petitioners to accomplish this purpose; that attempts were made to obtain the necessary financing for this project; that a "trial run," so to speak, was made by petitioners through the Purdell corporation with regard to the subdivision and development of a small real estate project in a nearby area (which unquestionably constituted a business as distinguished from *161 an investment); that unforeseen difficulties, such as the depression, Government service, the war, and illness prevented the accomplishment of petitioners' original plans in connection with the Manhasset real estate project; that the original plans were modified in that the petitioners decided to sell larger lots and parcels than those originally intended; and that the sales here involved were of property which was part of the Manhasset project made pursuant to the modified plan. It is true that the facts also show that relatively few sales were made over a long period of years, and a lack of aggressive salesmanship. This may be ascribed to the wealth, age, and varied interests of petitioners, rather than to an abandonment of their Manhasset real estate business project. There was no compulsion on them of any kind to accomplish this business project in a hurry. Undoubtedly their interest in it waned and clearly their plans in connection with its operation changed, but we are unable to conclude that it was ever abandoned. They undertook this project as a real estate business, and we are persuaded by the record herein that they continued it as such during the taxable years - not as *162 a "busy" business intent upon making prompt profits but as a type of business which might naturally be carried on by two aging and extremely wealthy persons such as the taxpayers herein. Accordingly, upon the issue presented, we decide in favor of petitioners. Decision will be entered under Rule 50.